**Petition of James E. HOWSER, an Individual, trading as Howser Boat Company for Exoneration from, or limitation of Liability as late owner of an Unnamed Motor Vessel.**

**Civ. No. 1779.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Feb. 28, 1964.

Bradley, Gebhardt, DeLaney & Millette, Charlotte, N. C., James C. Smathers, Hickory, N. C., for petitioner.

McElwee & Hall, North Wilkesboro, N. C., for respondent.

WARLICK, District Judge.

This proceeding for limitation of liability (46 U.S.C.A. § 183 et seq.) comes about from a boating collision which took place on April 11, 1962, on what is commonly called "Lake Hickory", a body of water which came into existence when a dam was built by the Duke Power Company on the Catawba River, at the old Oxford Ford site. The accident resulted when petitioner's boat, an Owens Flagship Flying Bridge Express Cruiser, of 185 horsepower, was in collision with a 16 ft. mahogany custom built outboard motorboat of 35 horsepower, owned and operated by Dr. S. J. Potts of Taylorsville, North Carolina.

The petition for limitation of liability was filed on May 21, 1963, in which, among other things, it was set out, that petitioner, James E. Howser, who indi-

vidually trades under the style name of The Howser Boat Company, of Charlotte, North Carolina, on the 11th day of April, 1962, was requested by one James Keever to bring such boat to Lake Hickory, where it could be seen and examined. Obedient thereto, petitioner brought such boat from the place where it was moored on the Wateree River in South Carolina, using a trailer, to Charlotte, and then on a trailer to Lake Hickory, and to a place on such lake known as Taylorsville Beach, in Alexander County, in the Western District of North Carolina.

Whereupon petitioner's boat was launched from the trailer into the waters of the Catawba River, and while petitioner was operating said boat he decided to check the engine, and thereupon requested an individual known as Jack Harris who was in the boat with petitioner, to take the helm. Then petitioner went to the "afterpart of the boat" and sat down on the after deck to examine its engine. While Jack Harris was operating the boat it collided wtih the boat of Dr. Potts, knocking Dr. Potts from his boat into the water, and causing all of his personal property to be cast into the water; and ultimately those in the vicinity were able to rescue him from the Lake.

That on the same day petitioner's boat was sold to James Keever for $4,000, the alleged value of petitioner's interest in said boat as claimed.

Petitioner further alleges that the collision was in no wise caused by any fault on his part, but that such was attributable directly and solely to the negligence of Dr. Potts, which allegations of negligence are set out under twelve numbered sections of the petition.

I was asked to sign certain orders, all as prayed for in the petition and more particularly an injunction restraining prosecution of all suits, actions, and proceedings, already begun for damages sustained, all as is prescribed in Rule 65(a) (b), Fed.Rules Civ.Proc.

Petitioner also filed bond in the sum of $4,000 with good and sufficient surety, as the law requires.

After going carefully into the petition and having its contents fully explained, I refused to sign such orders but did set the matter down for a subsequent hearing which came about at Charlotte following notice to Dr. Potts and his counsel.

At such hearing and from the evidence heard and the arguments made, I find the following facts:

That the collision between the boat of the petitioner Howser and the small craft of Dr. Potts took place at approximately 7:15 p. m. on the 11th of April, 1962; at which time Dr. Potts was fishing from his boat on the waters of Oxford Lake, commonly called Lake Hickory, on the Alexander County side of the Catawba River and approximately 150 ft. off the Taylorsville Beach point.

That the boat was a 16 ft. custom built fishing boat; that it was in a stationary position with lights on the front and back of said boat and additionally a utility red light near the middle of the boat was flashing off and on, and that under such circumstances the boat of Dr. Potts was struck somewhere in the middle, turned over, casting him into the waters of the lake, causing much of his fishing gear and personal property to be damaged and lost, and his boat badly damaged.

That the petitioner Howser was either operating his cabin cruiser or it was being operated by Jack Harris, who was in petitioner's boat, by and with his consent, and approval, and at his suggestion, and who petitioner requested to take the helm of the vessel and direct its full movement.

That shortly thereafter petitioner most likely acquainted Dr. Potts with the name of his insurance carrier, for on April 20, 1962, a Mr. Kempler, representing the American Motorist Insurance Company of Charlotte was given an itemized statement of the damages claimed by Dr. Potts to his property. However at that time Dr. Potts was unable to estimate the extent of his personal injuries as said paperwriting shows.

Thereafter, on August 27, 1962, Mc-Elwee and Hall, attorneys for the Respondent wrote a letter to the General Adjustment Bureau with respect to the claim against petitioner, for damage to property and personal injuries received. On August 31, 1962, J. A. Fisher, Branch Manager of the General Adjustment Bureau answered such communication and made an appointment with the attorneys for Respondent, for Friday, September 7, 1962, which date was accepted by the attorneys for Dr. Potts on September 4. Since nothing evidently resulted from such purported correspondence and meeting, Dr. Potts instituted his action in the Superior Court of Alexander County on April 12, 1963, in which he alleged among other things that petitioner's boat was operated on the waters of Lake Hickory carelessly, negligently, and heedlessly, and in a willful and wanton disregard of the rights and privileges of others, and at a speed and in a manner most likely to endanger the safety of others boating on such lake. The petitioner's boat was not equipped with headlights, had no artificial lighting whatsoever, and further that petitioner had entrusted said boat to one under his authority who was not competent to operate such cabin cruiser.

That he is 48 years of age, sustained serious, painful and permanent injuries to his spine, wrist joints, and lungs; that he of necessity incurred large medical bills, lost considerable time from his profession as a dentist, and that he has been principally damaged in a sum in excess of One Hundred Thousand Dollars.

In the arguments before me Dr. Potts resists the petition filed on three counts.

1. That the Catawba River is not navigable and that consequently the United States Courts have no jurisdiction of the limitation sought to be embraced in this action.

2. That the petitioner, owner of the cabin cruiser for which limitation of liability is filed herein, was present at the time of the alleged collision and was in complete charge of said boat and that it was operated by one designated by the petitioner, the owner, herein.

3. That the petition was not filed within six months after notice of claim had been given to or filed with such owner as Sec. 185 of Title 46 U.S.Code prescribes.

The principal issue here, when one considers the petition and the objections filed, is the navigability of the Catawba River, a stream which derives its name from an Indian tribe, The Catawbas, which inhabited this section of North and South Carolina several hundred years ago.

I have known the Catawba River practically all of my life and when a younger man used it quite often as my fishing grounds. It more than halfway encircles Catawba County and constitutes the natural boundary line between Catawba County and three other counties in North Carolina. It rises and has its source in the Blue Ridge Mountains of North Carolina, at a point just east of the Eastern Continental Divide, in the Pisgah National Forest, and finally flows into South Carolina where it is called the Wateree, and later by joining with the Congaree, forms the Santee and empties into the Atlantic Ocean near Georgetown.

Likely there is no river in America, particularly that part of the Catawba that flows through the Piedmont Section of North Carolina, that has as much rocky bottom or which has more shoals capable of being used for dam sites. Prior to the time when it was harnessed for electrical energy it was known as a mountain stream of clear, pure water, moderately moving in its flow, and yet when the rains came it developed into a great agency for destruction, bringing about almost unbelievable damage from its rising waters. Old timers in other years often referred to the terrible flood of 1900, and later in 1916 its flood waters reached almost unbelievable proportions and destroyed property of untold value.

Today it probably is one among the most harnessed streams in America and through such means great electrical ener-

gy is developed by its impounded waters, and its stream flow being so controlled that the damages often suffered have been completely eliminated. Eleven dams have been constructed along its flow of approximately 215 miles in North and South Carolina, and as such constitutes an amazing story of electrical energy production.

Around the turn of the century James Buchanon Duke, who had already amassed a fortune in the manufacture of tobacco, sensing the need for the development of the Piedmont Sections of North and South Carolina, and realizing the po-tential of the Catawba River, conceived the idea of a series of dams on the Catawba River in North Carolina and the Wateree in South Carolina, and shortly thereafter built the first dam for the storage of water and the generating of electrical energy. It was called the Catawba Dam, later changed to the Wylie Dam.

Through the intervening years and until the completion in 1963 of the Cowan's Ford development, eleven dams have been built. These developments with location as to river mile, date of completion and capacity (KW) are here shown:

| DEVELOPMENT | RIVER MILES | DATE OF COMPLETION | CAPACITY (KW) |
|---|---|---|---|
| Bridgewater | 275 | 1919 | 20,000 |
| Rhodhiss | 239 | 1925 | 25,000 |
| Oxford | 222 | 1928 | 36,000 |
| Lookout Shoals | 212.5 | 1915 | 18,720 |
| Cowan's Ford | 179 | 1963 | 350,000 |
| Mountain Island | 163.5 | 1923 | 60,000 |
| Catawba | 138.5 | 1905 and 1925 | 60,000 |
| Fishing Creek | 100.5 | 1916 and 1927 | 36,720 |
| Great Falls 1/ | 98 | 1907 | 24,000 |
| Dearborn 1/ | 98 | 1923 | 45,000 |
| Rocky Creek 2/ | 96 | 1909 | 24,000 |
| Cedar Creek 2/ | 96 | 1926 | 45,000 |
| Wateree | 73.5 | 1919 and 1925 | 56,000 |

Each of these dams as constructed is several hundred feet and more in height and as such constitute an absolute physical deterrent to navigation from one to another.

The waters impounded in each dam do not back upstream to the dam above, and often in its operation in a normal period when the flow of the water is controlled, it is easily possible for one to cross the Catawba River on foot at points below the dam, for several miles, where the control operation is then in effect.

The electrical energy generated from these dams annually produces a large amount of revenue, and anticipating such income, Mr. Duke made provision for its use down through the years, by setting up a perpetual trust for its use and management.

Here I would be lacking in my appreciation of Mr. Duke's vision and its subsequent effect upon the economy and the general welfare of North Carolina if I did not pay a tribute of appreciation for the things which he conceived and actually brought about in these acts. On December 11, 1924, he established the Duke Foundation, a perpetual trust, with a purpose in mind " * * * to make provision in some measure for the needs of mankind along physical, mental and spiritual lines * * * ", and thereupon made an initial gift of $40 Million Dollars worth of stock to said endowment, and made further provision whereby other

large sums of money would be placed in said trust. From these gifts, beginning at the time of the establishment of said trust and continuing from year to year, the present worth of the stocks amounts to approximately $478 Million Dollars; since that time, its trustees have distributed to the beneficiaries of said endowment in excess of $200 Million Dollars. Duke University was established, every building on its campus and every other agency involved in its makeup has been paid for from the endowment resources. Three other great universities have benefitted through these years to the value of more than $17 Million Dollars; Hospitals, $42 Million; Orphanages, Superannuated Methodist preachers, the building and operating of Rural Methodist Churches, and other beneficiaries spelled out in said endowment have likewise benefitted in that same period of time in excess of $18 Million Dollars. I mention this not only as showing his gratuity, toward mankind, but for the reason that through that period 55.57% of the amounts disbursed is represented by dividends earned on stock of the Duke Power Company held in the trust endowment. In 1962 dividends on such stock of the Duke Power Company paid toward these designated beneficiaries almost 78%.

Sec. § 183 of Title 46 U.S.C.A., the law under which the petition is filed reads as follows:

"(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The problem here is very important for this court in the Western District of North Carolina, for that within its geographical area of 28 counties myriad interior lakes are found in well nigh every section. This comes about obviously through the fact that men have determined upon the necessity for the storing of water, and thereby creating facilities for recreation and pleasure, as well as hydro-electric developments. Pleasure boating, now within the means of every average person, is on the increase on each of the hundreds of lakes to be found, and inevitably, as highway accidents have multiplied from the ownership and use of automobiles, so will the small boat accidents on these many lakes. For that reason I have been very determined to fully find all of the existing facts and to carefully set forth my reasons therefor, both in fact and law.

On the shoreline on either side of the Catawba River, where the dams have been constructed, an almost unbelievable number of homes have been built through the years, and each day apparently sees others being erected,—particularly on Lake Norman, the last of the Duke Power developments, which has a shoreline of approximately 500 miles and covers approximately 40,000 acres. Since the Piedmont area is rapidly expanding in population and economy, an end in the development of homesites and recreational conveniences is certainly not in sight. Boating is one among the outstanding facilities and recreational sports and literally thousands of craft are dotting the various waters of these lakes.

It is contended by petitioner that Sec. 183 of 46 U.S.C.A. gives the right to "the owner of any vessel" to seek the benefits of limitation regardless of the public navigability of the waters in a federal sense. A similar contention was made In re Madsen's Petition, D.C., 187 F.Supp. 411, (1960) in that there as here the petitioner contended that the tie-in between owners of all vessels used on lakes by Sec. 188 with the provision of Sec. 183 et seq., separates the limitation of liability statutes from the general and

maritime jurisdiction with its settled concept of public navigation in the federal sense. Judge Foley in dealing with that contention very interestingly noted, and I fully agree, that to follow this line of reasoning to a logical conclusion would put the limitation statutes within the reach of every boat owner on every inland and interior lake in North Carolina, no matter what its connection or possible connection with maritime commerce may be. This line of reasoning does not arise under the law and particularly is not applicable from the facts in this case.

We then come to what is meant by navigable waters. In The Daniel Ball case 10 Wall. 557–563, 19 L.Ed. 999 (1870), our Supreme Court gave the oft quoted definition of navigable waters of the United States, which under our system of dual sovereignty is the underlying essential for federal jurisdiction in maritime matters. There it was said:

"And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water."

This definition was reiterated in The Montello, 1874, 20 Wall. 430, 439, 22 L.Ed. 391, and endorsed in United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 406, 61 S.Ct. 291, 85 L.Ed. 243. 1 Benedict on Admiralty, 6th Ed., pgs. 92, 96. In re Madsen's Petition, D.C., 187 F. Supp. 411–414.

Mr. Justice Holmes in The Hamilton, 1907, 207 U.S. 398, 404, 28 S.Ct. 133, 134, 52 L.Ed. 264, relates the source of power of the Congress to legislate upon the subject of limitation of liability both to the power to regulate commerce and the clause in the Constitution extending the "judicial power to 'all cases of admir-

alty and maritime jurisdiction.'" Before that the relationship of the law of limited liability to our maritime code with the same territorial reach was expressed in Butler v. Boston & Savannah Steamship Co., 1889, 130 U.S. 527, 557, 9 S.Ct. 612, 619, 32 L.Ed. 1017:

"It being clear, then, that the law of limited liability of shipowners is a part of our maritime code, the extent of its territorial operation (as before intimated) cannot be doubtful. It is necessarily coextensive with that of the general admiralty and maritime jurisdiction, and that by the settled law of this country extends wherever public navigation extends—on the sea and the great inland lakes, and the navigable waters connecting therewith."

In its order issuing the license for the construction of the Cowan's Ford dam to the Duke Power Company, the Federal Power Commission goes fully into the many ramifications of the Catawba River, and among other things finds, "We do not think there is a general knowledge that the Wateree and Catawba Rivers are navigable above Camden, at about river mile 67", which is 6.5 miles below the Wateree development, the last down river dam constructed by the Duke Power Company.

Section 209.260 of the Code of Federal Regulations Title 33, Corp of Engineers, pertaining to navigable waters of the United States, has found that "The Catawba River, North Carolina, is not considered to be navigable waters of the United States and that this Department only exercises jurisdiction over the Wateree River to mile 67 near Camden, South Carolina, which is 6.5 miles downstream from the Wateree development, at mile 73.5 on the river."

The Power Commission further found "The existing navigation improvement project on the Wateree River extends from its mouth to mile 67 near Camden, South Carolina." Additionally it found that "the Wateree and Catawba Rivers are navigable waters of the United States at least as far up stream as applicant's

Catawba development, at mile 138.5 above the confluence of the Wateree and Congaree Rivers," which indicates beyond question that the Catawba-Wateree River is not in any sense considered to be a navigable stream by any authority of the United States above the Catawba Dam located below Ft. Mill, South Carolina,—preferably a fairer determination would be that it in no wise is considered as navigable other than below Camden, South Carolina.

In 1894 the Supreme Court of North Carolina had before it a case involving the waters of the Catawba River, and incidentally the depth thereof. Ironically enough this case centered about the same location on the river now covered by the impounded waters of the Oxford Development (Lake Hickory). The Court in its opinion found from the evidence offered that the depth of said river along that area averaged 2 ft. but in some parts it reached 4 ft. and that the river is about 300 ft. wide. Further finding that there are shoals on the Catawba in this area at intervals of about one half mile, where the depth is only about 8–12 inches at ordinary low water. Commissioners of Burke County v. Catawba Lumber Company, 116 N.C. 731, 740, 21 S.E. 941, 944.

It is further found that none of the eleven dams on this stream contain locks, and none of the eleven lakes contain marked navigation channels, or other aids to navigation.

Therefore I am of the opinion that the expansion of limited liability as is sought in this petition into the lakes created by these dams without the natural ingress and egress to commerce which they lack is untenable, under settled and clear judicial construction. Common sense is also involved, and "common sense often makes good law". Peak v. United States, 353 U.S. 43, 46, 77 S.Ct. 613, 615, 1 L. Ed.2d 631.

■ Therefore to contend that the waters of the Catawba River in North Carolina are navigable is to state a supposed fact which has little if any merit. It is

a human impossibility to take a boat from one lake to another except by sailing it to some landing site along the shore and thereafter transporting it by trailer or otherwise to the next succeeding body of water, created by the impounded dams, where it can again be set to sail.

It would hardly appear necessary, since determining as I have the first objection of Respondent, which as such decision indicates, holds that this court lacks jurisdiction to entertain the petition, yet in view of the objection filed by Respondent, that in substance petitioner was present at the time of the collision, was actually not only on said boat but was the owner and in full possession, and actually if not operating it, was having it operated by one Jack Harris who was doing so at petitioner's direction.

It will be noted that Sec. 183 contains this provision: " * * * without the privity or knowledge of such owner or owners * * *."

It is rather singular, as the facts disclose, that Jack Harris, who petitioner claims he requested to take the helm of the vessel while petitioner checked the engine, was tried in the Alexander County Court for the crime of reckless driving in the operation of the boat at the time herein, under N.C.G.S. Chap. 75–A, Sec. 10, and was acquitted, and that in the same court, petitioner, James E. Howser, was charged under a North Carolina Statute, G.S.N.C. § 75A–11, with failure to report an accident, arising out of this collision, and being adjudged guilty, was fined $100 and the costs,—which conviction was not appealed.

■■ The burden of proving the absence of privity or knowledge rests with the boat owner. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363, and that "privity or knowledge" embraces acts of omission as well as commission. Petition of H. & H. Wheel Service, 6 Cir. 1955, 219 F.2d 904.

■ Certainly it would thus appear that this was such personal participation by petitioner in this occurrence as would preclude limitation of liability in his

favor, since he was the owner and in complete charge of said boat. Failure to exercise the duty of control, when present, is in itself "privity or knowedge" so that the owner obviously loses the benefit of the limitation sought. Gilmore and Black § 10–24, pg. 704, 1957. Petition of Sause Bros. Ocean Towing Co., D.C., 193 F.2d 14, 1960.

The second objection interposed by Respondent clearly precludes petitioner for exoneration from or limitation of liability as is shown herein.

The Statute of Limitations as Respondent sets out as his third objection is not deemed necessary for consideration and is accordingly not determined.

The motion to dismiss the Limitation Proceedings herein for lack of jurisdiction is granted.

Costs to be assessed.

Counsel will submit decree.