F. William BREMMER, Jr.

v.

Charlene SHEDD

v.

Robert D. FRANCIS.

Civ. A. No. 76–142 Erie.

United States District Court,
W. D. Pennsylvania.

Feb. 7, 1979.

John M. Wolford, Erie, Pa., for plaintiff.

John W. Beatty, Erie, Pa., for defendant.

Richard H. Scobell, M. Richard Mellon, Erie, Pa., for third party defendant.

## OPINION

KNOX, District Judge.

When an accident occurs between vehicles moving on land there are usually skid marks, debris and other tell tale items discernible upon the ground or pavement which give a clue as to how the accident happened. When the accident occurs upon water, no traces are left of the movements of the boats or ships prior to the collision. The court, sitting without a jury, has to do the best it can with a mass of conflicting oral testimony together with certain physical facts disclosed by the damage to the boats in the collision. The instant case presents in a microcosm the difficulties involved in making a determination in such a case. As a matter of fact, resolution of the problems in this case, is as difficult as resolution of those in the sinking of the Andrea Doria. If the evidence produced on both sides is accepted, then the accident could not possibly have occurred. And yet we know the accident did occur. We do have the physical facts of the position of the boats following the collision and we do have testimony of unbiased third parties to wit: members of the Coast Guard crew who came upon the scene to engage in rescue operations. Unfortunately much of their memory has been dimmed with the passage of time.

The lawsuit arises from the collision of two boats shortly after midnight on Tuesday, August 3, 1976, in Presque Isle Bay. Presque Isle Bay, more commonly known as Erie Harbor or "The Bay," is a body of water approximately eight miles long lying immediately north of the City of Erie, Pennsylvania and almost completely enclosed by the Peninsula of Presque Isle containing Presque Isle State Park.[1] This is a piece of land approximately eight miles long in the shape of a lobster claw projecting into Lake Erie. On the east side, there is a channel through which vessels and motor boats enter and exit the Bay going to and from the waters of Lake Erie. There is no question that the waters of Presque Isle Bay are navigable waters; this collision between the two boats occurred on such navigable waters and, therefore, this is a matter properly within the jurisdiction of the admiralty court.

The exact locus delicti is uncertain. The witnesses state that it occurred approximately 250 to 400 yards (i. e. 750 to 1200 feet) southwardly from the entrance to the Presque Isle Marina. This is an excavated body of water located in Presque Isle State Park furnishing anchorage for small boats connected with the Bay itself by a dredged channel. The collision was between two boats, one owned and operated by the defendant Charlene Shedd, an 18 foot Silverline Mercruiser powered by an inboard-outboard motor developing 188 horsepower. The other boat involved was owned by the plaintiff, William Bremmer Jr., a 21 foot MFG boat, known as a "Gypsy E/Z Cruiser," with a 165 H.P. engine which was being operated at the time of the accident by Robert D. Francis. Francis was the third party defendant herein and the plaintiff in 76–150 Erie in admiralty, which case was consolidated with this action. The Shedd boat was operated by the owner herself.

As a result of the collision serious personal injuries were sustained by Rosemary Vershay, a passenger in the Bremmer boat, and by Robert D. Francis, the operator of the Bremmer boat. The suits for personal injuries brought in admiralty by Francis at 76–150 Erie and by Vershay at 77–4 Erie in admiralty have been settled since the trial of this case. The trial was held on four days commencing Monday, September 18, 1978, and terminating Thursday, September 21, 1978, before the undersigned member of the court. As a result of these settlements, we only have left the claim of plaintiff F.

---

1. The designation "Presque Isle" was first applied to the peninsula and harbor by the French during their occupation 1753·1758.

William Bremmer, Jr. for loss of his boat and personal property, totalling approximately $13,000, and certain minor personal injuries. It appears that Bremmer suffered minor bruises and shock as a result of the collision, was hospitalized and was absent from work for a period of three days.

The evidence shows that Charlene Shedd was boating on the day of August 2, 1976, and at approximately midnight, she picked up one Raymond Anderson as a passenger in the east Canal Basin, which is located east of the Public Dock on the southside of Presque Isle Bay near the foot of State Street, the main street in Erie. She then proceeded to cross the bay into the Presque Isle Marina a distance of approximately a mile and a half. She proceeded to enter the marina and turn around. The boat drifted for awhile and then proceeded to depart the marina through the channel and entered the bay. A short period of time thereafter, the collision in question occurred. As to exactly how it occurred is a matter which remains unclear and confused to the court after having listened to all of the testimony.

The Bremmer boat had five occupants: Bremmer's two minor children, who were sleeping in the forward cabin, Robert D. Francis, the operator who was positioned behind the controls on the starboard side forward of the boat, Rosemary Vershay who was seated to the left of Francis, and Bremmer, the owner, who at the time of the accident was standing near the stern of his boat. Bremmer states that he was putting away fishing gear and preparing for a trip the next day up Lake Erie. There is some indication, however, from the statements made by him to Seaman Eldred of the Coast Guard that he was working on the lights.

In any event, Bremmer and Francis, his operator and passenger, claimed that the collision occurred when they were proceeding in a northwesterly direction and preparing to enter Presque Isle Marina. They had made a slight turn to line up the lights which is necessary for a boat to negotiate the narrow dredged channel leading into the marina when the collision occurred. Defendant Shedd on the other hand claimed that she was going in a southeasterly direction across Presque Isle Bay to the Public Dock when the collision occurred. In other words the boats were approaching each other head on. Nevertheless, after the accident, it was found that the Shedd boat had struck the Bremmer boat either at right angles amidships or at an angle of approximately 120° abaft midships. The Shedd boat had sliced across the Bremmer boat so that a portion of the Shedd boat projected beyond the other boat and came to rest on top of the same. This was their positions as found by the Coast Guard. In other words, if we accept the Bremmer and Francis versions of the accident, Shedd would have had to pass them and, from some point in the rear, turned around and attacked them from the starboard side abaft midships. On the other hand, if we accept Shedd's version of the accident, it could not have happened unless the Bremmer boat had made a turn to port and was broadside to Shedd.

Both parties claim that their lights were illuminated at the time. There is no doubt that the water was calm; it was a warm summer night in August; visibility, which was good, was improved by the light of the half moon. Nevertheless, it appears that neither boat saw the other until a fraction of a second before impact. Bremmer filed a complaint claiming personal injuries and loss of his boat and personal property. There is no question that the Bremmer boat was damaged beyond repair. The defendant claims in her answer that Bremmer is barred from recovery by provisions of the Pennsylvania Motorboat Law, 55 Pa.C.S.A. § 485g (Supp.1978), and by contributory negligence and imputed negligence. Defendant claims that although he had entrusted the actual operation of his boat to Francis, Bremmer, as an owner on board, was the party in control at the time of the collision, and that there was privity or knowledge on his part which would bar recovery under 46 U.S.C. § 183.

Defendant Shedd filed a counterclaim against Bremmer who she claims was responsible for the negligence of Francis and his alleged failure to yield the right of way under the Great Lakes Rules and the Pennsylvania Motor Boat Law. Shedd claims damages to her boat in the amount of $1907.56. Shedd also joined Francis, the operator of the boat, as third party defendant. At Tr. p. 464, the court made the observation that it was "hopelessly confused by this evidence as how the accident could have happened". After mature deliberation and study of the transcript and briefs and arguments of the parties and the exhibits in the case this court still remains without any definite conclusion as to exactly how this collision occurred. There are many circumstances which give rise to questions in the court's mind but still the exact way this accident happened remains a matter of sheer speculation.

The court finds that Shedd had left the marina and was headed in a southwardly direction across the Bay. It is not clear, however, whether her course was such that she was going on a straight line for the Public Dock whence she had come or whether she was headed for a point approximately one-half mile west of that point on the south side of the bay. The court is also uncertain of the speed at which she was proceeding. Plaintiff Shedd insists she was not exceeding 10 mph but the violence of the impact would give rise to an inference that her speed must have been greater than 10 mph and there is also some testimony indicating that her boat was in a planing position. A boat is in a planing position when speed is increased at a certain point and the bow rises out of the water thus interfering with vision ahead. The court, however, considers this testimony to be sheer speculation precluding a definite finding as to her speed. We do find from her own testimony that the bow was elevated. There is also an indication from the testimony of Anderson that she had made a turn to starboard just before the collision. The testimony of Anderson, however, the court finds is so confusing that very little, if any, reliance can be placed thereon.

The court further finds that the Shedd vessel was properly lighted at the time of the collision. It was equipped with a red port running light and a green starboard running light on the point of the bow and a 360° white stern running light in the middle of the stern railing behind the engine. These lights were in operating order and were illuminated at the time of the accident.

The Bremmer boat, which was operated by Francis, was proceeding in the direction of the marina although there is some conflicting testimony from Seaman Overcast of the Coast Guard. Overcast testified that at the time of the collision, according to Bremmer, plaintiff's boat was proceeding from the Perry Monument, which is east of the entrance to the marina, and had turned slightly to port. See Tr. 228, 236. The difficulty with such a course of navigation is that the testimony also shows that the water is very shallow along the north shore of the Bay and that a boat coming in this direction would run the risk of going aground. Again, we have only sheer speculation as to the exact course of the Bremmer boat immediately before the impact. We do find, however, that it had made a corrective turn to port according to the statement given by Francis after the accident. See Boating Accident Report (D Ex 2).

It is also speculative as to whether the lights on plaintiff's boat were illuminated immediately prior to the collision. Bremmer and Francis testify flatly that they were illuminated. However, there is a statement made by Seaman Eldred, that he heard Bremmer say he had been "working on the lights, prior to the collision." Whether the lights were malfunctioning or had been extinguished or were illuminated immediately before the collision is another matter of speculation. The court finds nothing definite to contradict the statement of Bremmer and his operator that the lights were illuminated at the time of the collision.

The court further finds that the Bremmer boat was covered by the canvas top, which is used to protect the boat from the weather, which would interfere to some extent with the operator's vision.

The accident report given by Francis to the Pennsylvania Fish Commission (D Ex 2) states as follows:

"Vessel # 1 proceeding northward across bay toward marina. Lights of Vessel # 2 in view through forward window. Approx 500 + yards from marina entrance made corrective turn to port to align entrance. Had lost sight of lights of Vessel # 2. Continuing in westerly direction when lights of Vessel # 2 appeared for an instant on starboard side aft of mid-ships, then Vessel # 2 collided with us. Vessel # 2 obviously changed course at high speed."

It will be noted that in this report Francis states that he did see Vessel # 2, the Shedd boat, through the forward window, approximately 500 yards from the marina entrance. He then states that he lost sight of her lights. From the position of the Shedd lights it must have been obvious that the boat was approaching him almost head on at this time and, therefore he should have kept a lookout with respect to its movements. This corroborates his testimony that he had made a corrective turn to port to align the entrance lights so as to enter the marina and this is in accordance with his testimony at the trial. He agrees with Bremmer's testimony that he next saw the light of the Shedd boat. It appeared to be approaching them from the starboard side, and the collision occurred almost immediately thereafter.

The matter is further confused by the fact that certain witnesses, to wit: Francis, Bremmer and Seaman Moore indicated that the Shedd boat struck the Bremmer boat on the starboard side, at an angle of approximately 15° to 20° beyond a right angle. Their testimony would lend credence to the attack theory that Shedd had turned and was pursuing the Bremmer boat at the time of collision. On the other hand, Overcast and Anderson (P Ex 25 and 27) indicated

that the Shedd boat struck Bremmer at right angles. This is important because under the Great Lakes rules, which are applicable to this collision, the Shedd vessel had the right of way if it struck any point ahead of two points abaft the starboard beam. There is also testimony that the compass is divided into 32 points and dividing 360° by 32 gives each point 11.25 degrees of compass movement and therefore 2 points abaft the starboard beam would be 22.5° aft of the vessel's right angle at amidships or 112.5° from dead ahead on the starboard side of the vessel. As a result of the confusing testimony, the court can make no specific finding as to the angle at which the boats struck. If the Shedd boat was overtaking the Bremmer boat at an angle greater than 2 points abaft the starboard beam, then it would be in an overtaking position and have to give way to the Bremmer boat. The court has studied the photographs of the Bremmer boat (P Ex 1) and is unable to arrive at a conclusion which would place the angle of impact at a greater degree than 2 points abaft the starboard beam or an angle of 112.5° from dead ahead. As a matter of fact, a study of the photographs would indicate that most probably the Shedd boat struck the Bremmer boat at right angles which would clearly place it in a position where Bremmer had to give way to Shedd. The testimony, however, is so indefinite that the court can make no specific finding in this respect. It should be noted that we have D Ex 3, a drawing, made by Anderson, a passenger in the Shedd boat, the evening after the accident. The drawing shows that the Shedd boat struck the Bremmer boat at an angle of 45° from dead ahead but the photographs in evidence contradict this depiction and Anderson's testimony is so confusing and contradictory that we are unable to base any finding thereon.

The U.S. Coast Guard Rules of the Road, published on July 1, 1972, are the embodiment of the Act of Congress with respect to the operation of boats on the Great Lakes. 33 U.S.C. §§ 282–293. Rule 90.5 provides that when vessels are approaching head to head, normally they pass each other port

side to port side as vehicles upon a highway in the United States, with the exception of vessels that are so far on the starboard of each other as not to be meeting head on. Provision is made, however, for signals in such case. Rule 90.8 provides that signals are to be given in a situation where one vessel is overtaking another. In Rule 90.-8(b) it is provided that an overtaking vessel from a direction more than 2 points abaft the other's beam shall keep clear of the overtaken vessel until the overtaking vessel has finally passed and cleared. It is further provided that no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel. In Rule 90.10, it is provided that where vehicles are approaching each other at right angles or obliquely so as to involve the risk of collision other than in a case of a vessel overtaking another, the vessel which has the other on her port side shall hold her course and speed and the vehicle which has the other on her starboard side shall keep out of the way and, if necessary, slacken speed and reverse engines. Rule 90.12, provides that due regard for all dangers of navigation and collision and special circumstances may render a departure from the above rules necessary in order to avoid immediate danger.

While these Coast Guard Rules are on their face applicable only to steam vessels, nevertheless by regulations of the Coast Guard, the same are applicable to all pleasure craft operating on the Great Lakes. See P Ex 6(a) entitled "Coast Guard Official Recreational Boating Guide July, 1971" at p. 32, et seq. Both of the boats involved in this collision fall within Class 1, motorboats 16′ to less than 26′, (Ex 6(a), at p. 6), and the Coast Guard Rules are applicable to all vessels propelled by machinery. See Ex 6(a), at p. 35 where it is stated:

"Note that in these rules 'steam vessel' includes any vessel propelled by machinery."

At page 36, of Ex 6(a) attention is called to the application of the Rule of good seamanship, Rule 29. Rule 27 is found at 33 U.S.C. § 292 and reads as follows:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger. Feb. 8, 1895, c. 64, § 1, 28 Stat. 649."

Attention should also be given to Rule 28, 33 U.S.C. § 293 which reads as follows:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of a neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. Feb. 8, 1895, c. 64 § 1, 28 Stat. 649."

The testimony in this case shows that the Pennsylvania Fish Commission follows the Rules of the Road with respect to the operation of boats on Lake Erie including the waters of Presque Isle Bay thus obviating any possible conflict between these laws. If there were a conflict, the state would probably have to give way to the federal navigational rules, although it must be recognized that the state has a certain police power with respect to the waters immediately adjacent to its shores. However, the testimony in this case indicates that there are no special rules promulgated by the state with respect to navigation on the waters of Presque Isle Bay except those governing the speeds of boats in the channel providing the entrance and exit to and from Lake Erie and also those governing the operation of boats in the vicinity of the Public Dock at the foot of State Street.

■ The sum total of all this discussion is that the basic duty of each operator is to keep a proper lookout for vessels in the immediate vicinity and take such precautions as would be required by a prudent person to avoid a collision. While the circumstances of this particular collision are lost in the mist of sheer speculation from which the court is able to come to no definite conclusion, nevertheless it is clear that the operator of each boat did not keep a

proper lookout as to the movement of vessels in its immediate vicinity and did not take proper precautions to avoid a collision.

With respect to Francis, the operator of the Bremmer boat we find that he knew the Shedd boat was approaching from ahead, lost track of its lights, and paid no further attention to it until suddenly its lights appeared immediately off Bremmer's starboard side. With respect to Shedd, we find that she was not keeping a proper lookout and apparently made a turn and did not observe the approaching Bremmer boat. Whether Bremmer's lights were illuminated or not, it was a clear moonlit night and the boat should have been visible to her. If Bremmer's lights were illuminated, Shedd's failure to take proper precautions amounts to inexcusable neglect.

■■ Turning to the legal principles applicable to a situation of this kind, we find that the burden of proving negligence on the part of the ship, its master or crew rests upon the libelant. See 2 Benedict on Admiralty § 11, at 58, 59 n. 3 (7th ed. 1975). We find both with respect to plaintiff's complaint and defendant's counterclaim, that the evidence shows that each of the operators failed to keep a proper lookout and failed to take proper precautions to avoid a collision.

■ Although Bremmer had entrusted the operation of his boat to Francis, he was on board and in immediate control of the operator. Bremmer is therefore, a person in control of a vessel and is subject to the imputation of the fault of the operator under 46 U.S.C. § 183(a) which reads as follows:

"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, *or for any loss, damage, or injury by collision,* or for any act, matter or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such* owner or owners, *shall not,* except in the cases provided for in subsection (b) of this section, *exceed*

*the amount* or value of the interest of such owner in such vessel, and her freight then pending."

See *Tittle v. Aldacosta,* 544 F.2d 752 (5th Cir. 1977) and cases cited therein, holding that an owner present on the boat has a heavy burden of showing no privity or knowledge. We find here that Bremmer who was present and had entrusted the operation of the boat to Francis was in privity with him and that he had immediate control of Francis' wrongful acts or omissions and participated in the same. See *The Oneida,* 282 F. 238 (2d Cir. 1922). *In re Howser's Petition,* 227 F.Supp. 81 (W.D.N.C.1964); *Chimene v. Dow,* 104 F.Supp. 473 (S.D.Tex.1952) where several people had rented a fishing boat and each was held responsible for not keeping a proper lookout.

In view of the foregoing findings we find that each of the parties was 50% at fault. *U. S. v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) provides guidance for apportioning damages in such a situation. In that case, the old divided damages rule which required the equal division of damages when two or more parties involved were found to be guilty of contributing fault in admiralty, regardless of the relative degree of fault was abolished where the lower court had clearly found that one vessel was 75% at fault and that there was 25% at fault on the part of the government for a grounding. As stated by the Court at 407 of 421 U.S., at 260 of 44 L.Ed.2d, at 1713 of 95 S.Ct.

"The divided damages rule has been said to be justified by the difficulty of determining comparative degrees of negligence when both parties are concededly guilty of contributing fault. *The Max Morris,* 137 U.S. 1, 12, 11 S.Ct. 29, 32, 34 L.Ed. 586. Although there is some force in this argument, it cannot justify an equal division of damages in every case of collision based on mutual fault. *When it is impossible fairly to allocate degrees of fault, the division of damages equally between wrongdoing parties is an equitable solution.* But the rule is unnecessarily

crude and inequitable in a case like this one where an allocation of disparate proportional fault has been made. Potential problems of proof in some cases hardly require adherence to an archaic and unfair rule in all cases. Every other major maritime nation has evidently been able to apply a rule of comparative negligence without serious problems."

We find in this case for reasons above stated that it is impossible to allocate the degrees of fault on any rational basis and that it is not possible fairly to measure comparative degrees of fault. As stated by the Court at 411 of 421 U.S., at 1715 of 95 S.Ct., at 262 of 44 L.Ed.2d.

"We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."

At 405 of 421 U.S., 95 S.Ct. at page 1713, the Supreme Court said:

"It is no longer apparent, if it ever was, that this Solomonic division of damages serves to achieve even rough justice. An equal division of damages is a reasonably satisfactory result only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame, *or where proportionate degrees of fault cannot be measured and determined on a rational basis.*"

■ As previously stated, in this opinion, the court is unable to determine on any rational basis the proportionate degrees of fault in this case beyond holding that each party was guilty of failure to keep a proper lookout and failure to take all prudent measures to avoid a collision. The court determines that the parties are equally at fault and therefore each is entitled to recover one half of its damages.

■ Bremmer was catapulted into the water by the force of collision and was hospitalized for two or three days. His injuries amounted to a bruised chest; he was in pain for a week and a half to two weeks which he describes as "Just soreness more than anything". While he lost three days from work, he has sustained no monetary loss as a result thereof. We will therefore allow him $500 for pain, suffering and inconvenience which we find a fair amount in view of the amount of hospitalization and the medical bills in the case and the minor nature of his injuries.

In addition to plaintiff Bremmer's pain and suffering, he has bills set forth in Ex A attached to the pretrial narrative in the amount of $12,553.70, which includes loss of his boat at $10,021.60, and various miscellaneous items including hospital bills, tools and $537 in cash from his wallet lost in the wreck all of which claims the court finds to be correct, thus making total damages of $13,053.70.

With respect to the damages claimed by Charlene Shedd, she has bills for repairs of her boat totalling $1641.68 plus another bill of $310.55 for a total of $1952.23. While these seem to be estimates nevertheless they appear to be in order and a fair amount for the damages sustained and we will therefore allow them in this amount.

Under the rule in *U. S. v. Reliable Transfer Co.,* supra, since we find equal fault on each party, each party is entitled to recover from the other 50% of his claim. In Bremmer's case, this therefore will amount to ½ × $13,053.70 or $6523.35 for which judgment will be entered. In Shedd's case, this recovery will amount to ½ × $1952.23 or $976.12 for which judgment will be entered. Judgment, of course, may be set off against judgment. Since Francis as third party defendant is jointly liable with Shedd, he must reimburse her for one half of her liability to Bremmer.

The foregoing includes findings of fact as required by Rule 52(a).

An appropriate order will be entered.