In the Matter of the Complaint of BANKERS TRUST COMPANY as Owner–Trustee and Monsanto Company as Chartered Owner, and Keystone Shipping Co., as Chartered Owner and Operator of the SS EDGAR M. QUEENY, for Exoneration from and Limitation of Liability.

In the Matter of the Complaint of VILLANEUVA COMPANIA NAVIERA, S. A., Owner of the tank vessel CORINTHOS, for Exoneration from and Limitation of Liability.

Civ. A. Nos. 75–364, 75–2110.

United States District Court,
E. D. Pennsylvania.

Feb. 19, 1980.

See also, 503 F.Supp. 350, 503 F.Supp. 361 and 503 F.Supp. 365.

James F. Young, Krusen, Evans & Byrne, Philadelphia, Pa., for Queeny Interests.

Richard W. Palmer, Palmer, Biezup & Henderson, Philadelphia, Pa., for Corinthos Interests.

Benjamin F. Stahl, Clark, Ladner, Fortenbough & Young, Philadelphia, Pa., for BP Oil, Inc./Sohio Petroleum Co.

## MEMORANDUM OPINION

WEINER, District Judge.

### I

These admiralty actions arise out of a collision which occurred during the early morning hours of January 31, 1975, on the Delaware River at Marcus Hook, Pennsylvania. The vessels involved were the SS Edgar M. Queeny ("Queeny"), an American steamship, and the S.T. Corinthos ("Corinthos"), a Liberian steam tanker. At the time of the collision, the Corinthos was moored, starboard side, to the BP Oil Inc./Sohio Petroleum Company dock at Marcus Hook, Pennsylvania in order to discharge her cargo of crude oil. The collision and the resulting explosions caused extensive damage to the dock, the destruction of the Corinthos, oil pollution of the Delaware River, minor damage to the Queeny, damage to neighboring properties, and tragic loss of 26 lives and other personal injuries.

As a result of this incident, numerous proceedings were instituted. The personal injury and wrongful death actions were settled and dismissed, and therefore shall not be discussed in this opinion. A products liability action was filed by BP Oil Inc. and Sohio Petroleum Company against Bethlehem Steel Corporation, General Electric Company and The William Powell Company (See C.A. 77–2362). These defendants, collectively referred to as the products or third party defendants, participated in one aspect or another in the design and construction of the Queeny, her turbine set and controls, and the astern guardian valve. At the time of trial, the products liability action was severed and stayed pending the resolution of the limitation actions.[1] Also severed at the time of trial was the action of BP Oil, Inc./Sohio Petroleum Company against Vil-

---

1. The products liability action was severed on the granting of a motion of the products liability/third party defendants.

laneuva Compania Naviera, S.A., et al., owner of the Corinthos (See C.A. No. 75–1285).

In the instant limitation actions, the issue of damages was bifurcated from the issue of liability, and the cases then proceeded to trial before the court sitting without a jury. On the second day of trial, James F. Young, Esquire, attorney for the Queeny interests admitted that his client no longer sought exoneration. (N.T. Pgs. 38–39, July 19, 1979). Accordingly, our ·opinion will address the questions of whether the Queeny interests are entitled to limit their liability and whether the Corinthos and BP Ohio Inc./Sohio Petroleum Company interests can be exonerated from or limit their liability. For ease of understanding, our Findings of Fact, Discussion, and Conclusions of Law shall be recited in narrative form rather than in separately numbered paragraphs.

## II

The SS Edgar M. Queeny, Official Number 528567, is a single screw, steam powered tank vessel of 19,046 gross tons. She is 660.2 feet in length and 90 feet in breadth. She is powered by a 15,000 shaft horsepower steam turbine. She was designed and built as a multi–product chemical tanker by the Bethlehem Steel Corporation ("Bethlehem") during the mid–to–late 1960's for the Monsanto Chemical Co. The Queeny's turbine set and controls were designed and built by the General Electric Company ("G.E.") pursuant to a subcontract with Bethlehem. G.E. in turn, subcontracted with The William Powell Company ("Powell") for the manufacture of a valve known as a Marine Astern Guardian Valve, to be used in the turbine.

The Corinthos, Official Number 1916, was a single screw, steam powered tank vessel of Liberian registry of 30,705 gross tons. She was 723.7 feet in length and 106 feet in breadth. She was powered by a 17,000 horsepower steam turbine.

The Corinthos moored at the BP Oil, Inc. refinery dock in Marcus Hook, Pennsylvania at approximately 1500 hours (3:00 p. m., Eastern Standard Time) on January 30, 1975 and began discharging its cargo of crude oil. The Queeny moored across the river at the Monsanto Chemical Co. dock at Bridgeport, New Jersey at approximately 1248 hours (12:48 p. m., Eastern Standard Time) on January 30, 1975, in order to discharge part of its cargo.

At the time of docking, the Queeny was under the command of Captain Fay Kellog with Sverre Sorensen at the conn[2] serving as the pilot. Both Captain Kellog and Pilot Sorensen were familiar with the Queeny having participated in her docking and undocking maneuvers many times. At approximately 2300 hours (11:00 p. m., Eastern Standard Time) the vessel began preparations to depart Bridgeport, New Jersey and proceed to Paulsboro, New Jersey. As part of these preparations, the Third Mate, Robert Downs, and an engineer tested the engine order telegraph at the bridge and engine room locations, the steering gear, the bow thruster, and synchronized the wheelhouse, chartroom and engine room clocks. The equipment which was tested was found in good operating condition.

·Since the Queeny was moored port side to the pier, it was necessary for it to make a 180° starboard turn upon leaving the dock in order to proceed upstream to the next discharge facility at Paulsboro, New Jersey.

At approximately 0006 hours (12:06 a. m., Eastern Standard Time) on January 31, 1975, the Queeny departed the Monsanto terminal. Its draft at that time was 36 feet forward and 36 feet 10 inches aft. The weather was clear and cold with visibility of 8–10 miles. The tide was flooding with a current of about 1.5 to 2.0 knots and the eastern half of the Marcus Hook channel was closed for dredging operations. The dredging operations reduced the channel width from its normal 800 feet to 400 feet. The "Local Notice to Mariners" required vessels to proceed up the western half of the channel.

---

**2.** Conn is a nautical term meaning control of the ship.

During the undocking maneuver, the master and pilot were on the bridge; the third mate, Robert Downs, was manning the engine order telegraph; and the quartermaster, Daryl Sutton was at the helm. In the engine room at this time were the first assistant engineer, George Zahar, at the engine control with third assistant engineer, J. King; and engineman, J. Tomczak. At the forecastle docking station were Michael Casey, first mate; and Arvie Harris, able seaman; along with several other crew members. At the after docking station was chief mate, Lee Woodward, with various other members of the ship's crew assisting to undock the vessel.

In maneuvering from the dock, the Queeny used its main engine and bow thruster, and had its rudder hard left. The Tug Tanda 12, which was engaged to assist with the undocking, was positioned on the port bow and was in radio communication with Pilot Sverre Sorensen who was at the conn. Both anchors on the Queeny were ready to let go, to the degree that it was necessary only to remove the riding pawl and disengage the braking mechanism.

At the time of letting go the lines, prior to departing, Pilot Sorensen made a safety call on Channel 13 of the VHF stating that the Queeny was preparing to leave the dock at Monsanto. Once the vessel was clear of the dock and was proceeding into the river, a second safety call was made. Also at that time the Queeny began backing and filling, using a series of astern and ahead maneuvers in conjunction with the ship's rudder, the bow thruster, and the tug boat to facilitate the starboard turn of the vessel to position her to head upriver. As she was heading into the channel both Pilot Sorensen and Captain Kellog were aware that the eastern half of the channel was closed.

At about 0010 hours (12:10 a. m., Eastern Standard Time), Tug Tanda 12 was pushing the port bow of the Queeny to assist the ship in the turning maneuver. At about that time, Pilot Sorensen came into radio contact with Captain William Kegel, Master of the upbound S.S. Pennsylvania Sun in order to discuss the Queeny's intentions.

During this time, the bow thruster was on right thrust and the Queeny's engines were placed on half ahead with rudder hard right. In the period of time between 0010 and 0022 hours, the Queeny backed and filled approximately twice in order to facilitate its turn.

Located in the river approximately 1060 feet from the Monsanto dock and 1,440 feet from the channel edge is anchor buoy D. At about 0022 hours, the Queeny approached buoy D, said buoy being located about 30–35 yards from the port bow, bearing well to the left of the bow. Also at that time, the Tug Tanda 12 was released from the port bow and was instructed to stand by at Paulsboro, New Jersey. Captain Kellog was on the starboard wing of the bridge and Pilot Sorensen was on the port wing.

Though the rate of swing materially decreased upon the release of the tug, Captain Kellog felt no cause for concern because he expected Pilot Sorensen to back and fill additionally as he had done on other occasions in that same turn across the river or in similar maneuvers. However, as the rate of swing decreased, the Queeny's forward acceleration increased.

At this point, Captain Kellog became apprehensive that the Queeny would not clear the Corinthos because of Pilot Sorensen's failure to continue to back and fill, and because of the decrease in the rate of turn. Though Captain Kellog voiced his concern about the "closeness" of the situation, Pilot Sorensen replied, "Captain, she should make that O.K.", or words to that effect.

Shortly thereafter, Captain Kellog again voiced his concern to Pilot Sorensen, stating: "Captain, I think we better go astern because we will be very close on this maneuver", or words to that effect. Captain Kellog received no response to his statement. He noted that Pilot Sorensen was engaged in a radio exchange with Captain Kegel of the S.S. Pennsylvania Sun.

Captain Kellog became concerned with the proximity of the Queeny to the well lighted Corinthos, and he ordered full astern. That order was rung up on the

engine telegraph by Third Mate Downs. The full astern order was promptly acknowledged by the First Assistant Engineer, George Zahar, who then executed the order.

Shortly thereafter, Pilot Sorensen ordered a "double jingle" which order was received and promptly acknowledged by the engine room. The order had little impact on the operation of the engines in that Mr. Zahar had already opened the throttle as far as he thought could be safely done. The rate of the Queeny's turn to the right was reduced as the propeller responded to the full astern order.

As the bow of the Queeny continued to ease closer to the Corinthos, Pilot Sorensen recommended that the starboard anchor of the Queeny be dropped. Captain Kellog apparently acquiesced in that he gave that order via his walkie talkie. No response was received because Arvie Harris, the Bow Lookout and the only person stationed at the windlass anchor watch position, had fled the extreme bow, seconds before, in the face of an impending collision.

Moments later, the Queeny came into contact with the Corinthos. The first contact produced sparks as a result of scraping between the two vessels. Due to the shock of the initial contact and the ships' rolling and pitching, there was an interval of intermittent non–contact and contact. It was during the subsequent contacts that the port fluke anchor of the Queeny punctured the port shell plating of the No. 4 and/or No. 5 cargo tanks of the Corinthos. During this time period, there was a series of explosions, followed by a conflagaration.

Immediately after the collision and first explosion, third mate Downs instinctively rung up "Stop" on the engine telegraph. Shortly thereafter, Captain Kellog noted that the tachometer indicated 0 RPM's and called to Mr. Downs for full astern. That order was executed but not without a degree of confusion.

Captain Kellog, in an effort to emphasize the order, took the bridge telegraph control handle and signalled what he believed to be "Full Astern." Inadvertently, the tele-graph was moved to "Bridge Control" following which the First Assistant Engineer called the bridge by telephone to confirm the request. Failing to receive a response from the bridge, the engineer moved the throttle control selector to the "Bridge Control" position. After some confusion, the bridge selector switch was moved from "Bridge Control" to "Full Astern", which signal was received and responded to by the engine room. The Queeny's propeller then began to turn in reverse.

Efforts to back the Queeny away continued until 0041 hours, at which time the Queeny pulled clear, and was able to proceed "full ahead" away from the burning Corinthos. While the Queeny headed downriver toward an achorage area, its crew was engaged in extinguishing a fire on the Queeny's forecastle head.

At approximately 0100 hours (1:00 a. m., Eastern Standard Time), the Queeny anchored at a position close aboard buoy C of the Sun Oil dock. At about 0305 hours, she began to heave anchor and shifted to another anchorage which was completed at about 0345 hours when the Queeny safely anchored.

Meanwhile, the fires aboard the Corinthos continued to burn out of control through the early morning hours of January 31, 1975. During the course of the firefighting activities, the Delaware River was intermittently opened and closed to traffic as the danger of additional fires fluctuated.

Eventually, the fires and explosions on board the Corinthos caused that ship to break in half and to immediately sink near by the BP dock.

### III

Limitation and/or exoneration of a vessel owner's liability is provided for in Title 46 of the United States Code, Section 181 *et seq.* The section pertinent to the issues in this case is Section 183(a), which in relevant part, provides:

"The liability of the owner of any vessel . . . for any . . . loss, or destruction by

any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage or injury by collision, or for any act, matter, or thing, loss, damage, forfeiture, done or occasioned, or incurred without the privity or knowledge of such owner or owners shall not, . . ., exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

██ The analysis of whether the Queeny interests are entitled to limit their liability involves a two–step process. First, we must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, we must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness. *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, rehearing denied, *African Neptune, S.S.,* 532 F.2d 1375 and *Farrell Lines, Inc. v. Jones,* 532 F.2d 1375 (5th Cir. 1976). Negligent actions or unseaworthy conditions of which the vessel owner has knowledge or privity will trigger the denial of limitation. *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). Moreover, it is settled that the claimants bear the initial burden of proving negligence or unseaworthiness while the Queeny interests bear the burden of proving lack of privity or knowledge. *Farrell Lines, Inc. v. Jones, supra.*

The parties do not dispute that the predominating cause of this disaster was Pilot Sorensen's failure to properly execute the starboard turn into the Marcus Hook channel due to his navigational error. In addition, it is clear that navigational error on the part of the crew generally occurs without the privity or knowledge of the shipowner, and is not attributable to an absent owner for purposes of limitation of liability. *Tittle v. Aldacosta,* 544 F.2d 752, rehearing denied 546 F.2d 906, 907, rehearing denied 582 F.2d 12 (5th Cir. 1977).

## IV

The claimants in this case however, have argued and presented voluminous testimony

and exhibits to the effect that other acts and/or conditions of which the Queeny interests had knowledge or were privy to contributed to the accident.

BP Oil, Inc. and Sohio Petroleum Co. contend that contributing causes of the collision were:

(1) The failure of shoreside management to use due diligence to discover and remedy the damage to the astern turbine which reduced the Queeny's astern power by 40% and rendered her unseaworthy;

(2) The commitment by management of discretion to the master to disregard company instructions requiring an anchor watch while maneuvering in congested waters which precluded the dropping of the anchors, which could have prevented the collision; and

(3) The continued pressure of Monsanto on Keystone to cut costs, which resulted in the failure to use the bridge control and premature relief of the bow detail without posting an anchor detail.

The Corinthos interests raise the same three points and allege as other contributing causes of the collision:

(1) The failure of shoreside management to instruct the master and officers of the Queeny to use tugs throughout any starboard turning maneuver in confined or restricted waters because of the Queeny's inability to properly turn starboard;

(2) The failure of shoreside management to instruct the master and officers of the Queeny that the bow thruster power had been increased by the shipbuilder from 1200 to 1600 amps; and

(3) The failure of shoreside management to inquire into

(a) The reason the master refused to perform a crash stop test, and into

(b) The master's apprehension that such a test would damage the vessel's propulsion system.

## V

██ After review of the evidence we conclude that the Queeny interests are not

entitled to limit their liability. Factors other than navigational error, to which they were privy or had knowledge, contributed to the collision.

The issue which dominated much of the claimants case was the alleged defective condition of the astern turbine and the astern guardian valve. They introduced evidence which established that the valve and turbine were in a damaged condition and were contributing causes of the collision. The claimants contended that if the astern turbine performed properly on the night of the collision, the Queeny would have been able to stop prior to contacting the moored Corinthos.

The turbine set for the Queeny was supplied to Bethlehem Steel Corp. by General Electric, who in turn had selected The William Powell Company to supply the astern guardian valve.

The astern guardian valve is physically located on the main steam line just outside the steam inlet to the astern element of the low pressure turbine. It is the last valve the steam passes through before entering the astern turbine. Its purpose is to guard the astern turbine from an accidental opening of the astern throttle valve while the turbine is turning forward RPM's.

When the astern guardian valve is opened, steam will pass into the astern turbine and reverse the engine. If steam was accidently released into the astern turbine while it was at full speed ahead, the turbine would be severely damaged.

The basic valve is a disc, 5″ in diameter and 6″ high, which is attached to the end of a stem. The disc moves up and down inside the valve body as the stem is raised or lowered by operation of a motor. The stem also can be operated by a hand wheel. The bearing surfaces of the disc, which touch the valve body are referred to as the guide surfaces.

The clearances between the guide surfaces and the valve body, at normal room temperature, is 10–12/1,000ths of an inch, as designed.

The disc and valve body were both manufactured of the same material, which was grade ASTM–217 (grade WC6) cast steel. Neither the disc nor the body was specifically treated to obtain differing degrees of hardness.

The operation of the valve is as follows. Steam enters the valve through an inlet in its side and exits through a hole in the bottom of the valve. When the valve is open the disc is lifted to partially clear the inlet at the side and open the hole in the bottom. When closed, the valve seats on the bottom of the body, closing the exit hole. On the inside of the valve body, the inlet opening presents a sharp edge past which the guide surfaces must travel on opening or closing. As the disc travels up and down, it is held in position by the guide surfaces which contact the body of the valve. The stem does not provide guidance to protect against contact between the valve disc and valve body, but merely moves the disc up and down.

VI

The defect in the astern guardian valve was the galling or gouging of its surface, caused by the rubbing of the two metal castings manufactured from the identical grade steel. As the surfaces rubbed together, the effect was a welding together of the surfaces followed by the chiseling free of pieces of metal. The continued operation of the system, caused larger pieces of metal to break free which metal pieces were then projected into the astern turbine by the passing steam. The metal pieces damaged the turbine's blades. The damage to the astern turbine's blades reduced the Queeny's astern power.

The significance of the reduced astern power is manifest. When Captain Kellog ordered full astern in face of the impending collision, the Queeny's engines did not properly respond to the command. The turbines of the Queeny were designed for normal sea use and had been guaranteed to run at an astern RPM equal to 70% of 109,[3] which is

3. 109 R.P.M. is the full ahead rating of the turbines.

76.3 RPM. In an undamaged condition, the Queeny's astern turbine would have responded to the full astern command by producing 76.3 RPM. On the Queeny's sea trial run, it achieved astern power of 76 RPM. However, on the night of the collision, the astern turbine did not produce the guaranteed level of astern RPM's. It is clear that the condition of the Queeny's astern turbine rendered her unseaworthy.

Moreover, the expert of the Corinthos interests established that if the Queeny's astern turbine functioned properly, the Queeny would not have collided with the Corinthos.

To that effect, the Corinthos interests' finding of fact #87 is accepted and adopted by this Court. It reads as follows:

"87. Dr. Corlett reconstructed the events of the night of the collision to confirm that the QUEENY: (a) If navigating with a damaged astern turbine and the slow rate of change of recorded RPM on the night of the collision from half ahead to full astern (with all other conditions being the same as on the night of the collision), she would have collided with the CORINTHOS. His findings precisely followed the facts of the collision which actually took place that night. (C–343, Line 1) [Dr. Corlett's Matrix on the Court Room Easel]. (b) If all other conditions were the same as on the night of the collision, but with the astern turbine undamaged and 76 RPM's astern recorded at the rate of change recorded on the official Sea Trial Tape, there would have been no collision. (C–343, Line 2) See also, (Line 4 of C–343) where it is again demonstrated that undamaged turbine permits the vessel to avoid collision where the vessel achieved 76 RPM astern at the rate of change recorded at sea trials: (c) Again, assuming that all other conditions were the same as on the night of the collision, but with the astern turbine as damaged and that only 70 RPM's astern were recorded showing a rate of change recorded on the RPM tape as shown on the night of the collision, there would have been a collision. (C–343–Line 3).

Thus, on the night of the collision, even if the engineer's achieved 70 RPM as claimed by Zahar (who was relying on the Bridge Logger Tape), there would have been a collision in any event. The Bridge Logger Tape is the only tape which can conceivably be read as 70 RPM astern on the night of the collision. (d) if the vessel had achieved 76 RPM's astern on the night of the collision with an undamaged turbine and the RPM's were recorded on the night of the collision, there would have been no collision. (C–343, Line 5). (e) Finally, Dr. Corlett proved that if only 65 RPM's astern were achieved with a damaged turbine, and the rate of change were identical to that recorded rate at the time of sea trials, there would have been no collision. (C–343; Corlett N/T 1397–1405; C–87).

Thus, whenever the vessel was functioning with damaged turbines, a collision resulted except for line 6 on C–343. The hypothetical situation outlined there by Dr. Corlett (i.e. application of the rate of change of RPM's as rapidly as on the sea trials), could not have happened on the QUEENY on the night of collision because the engineers would not apply the sea trials rate of change. Each one testified and confirmed that such a rate of change would have risked loss of power through a boiler surge. (Breton Dep. 80–82, Q–78; Ross Dep. Sept. 21, 1978, 19–20, 22, 49, 53, 48–49, 73–74, 131; C–355; Zahar N/T 381, 387)."

## VII

In order for this finding to be fully comprehended, it is necessary to describe the method by which commands are given to the Queeny's engines, and the meaning of "rate of change".

Commands to the Queeny's engines and control of her main throttle can be effectuated by three different methods. (1) Directly, termed "Bridge Control", whereby a throttle in the wheelhouse is operated which automatically controls the direction and speed of the engines; (2) Automatically by the engineer on watch by using the

engine room console, termed "Central Control"; or (3) Manually by the engineer on watch by operating the throttle control valve by hand, termed "Manual Control". When the ship is operating on either "Central Control" or "Manual Control" the engineer on watch receives his commands via the engine order telegraph.

When the ship is operating on "Bridge Control", the bridge has direct control of the ship's maneuvering speed and direction, and the response time of the engine is greatly reduced. Operation on either "Central Control" or "Manual Control" necessarily increases the engine response time because additional steps are taken before the throttle is adjusted in compliance with an order from the bridge.

Rate of change as used in the above paragraphs refers to the elapsed time from the time the full astern order was given by Captain Kellog until the time the throttles were actually placed on full astern. Operation on Bridge Control permits the Captain or Pilot to place the throttles in any position desired within a matter of seconds. On its sea trials, the Queeny was operated on Bridge Control, and the throttle response was approximately 5 seconds. Dr. Corlett's findings establish that if the sea trial rate of change (i.e. virtual instantaneous throttle response) applied, the Queeny would not have collided with the Corinthos, provided the engine achieved a minimum of 65 astern RPM's.

On the night of the collision, the Queeny was operating on Central Control. Central Control requires a desired command to be transmitted via the engine telegraph in the wheelhouse to the engine telegraph indicator in the engine room, an acknowledgment by the engineer, and then execution of the order by the operation of the control wheel which will automatically activate the throttles. On the night of the collision, operating on Central Control, 1 minute and 45 seconds elapsed from the time the order for full astern was given until the throttle was placed on full astern. In comparison to the amount of time which would have elapsed if the vessel was operating on Bridge Control,

Dr. Corlett termed the rate of change on the night of the collision, slow. His findings establish that given the slow rate of change, the Queeny could have avoided the collision only if the vessel produced 76 astern RPM's. Though we do not find the failure to use "Bridge Control" to be a contributing cause of the collision, it is clear that the inability of the vessel to produce 76 astern RPM's was a contributing cause of the collision.

VIII

Because we have determined that the astern guardian valve and the astern turbine were defective at the time of the collision, and were contributing causes of the collision, we shall not make a finding regarding the claimants other alleged causes of the collision. Instead, we shall proceed to determine whether the Queeny management interests were privy to or had knowledge of the defective condition of the astern turbine and the astern guardian valve. We have concluded that the requisite knowledge existed.

■ The parties do not dispute that in the case of a corporate owned vessel, the privity or knowledge issue turns on whether shore–based high leveled management was aware or should have been of the likelihood of the occurrence happening after the ship was under way. *Tittle v. Aldacosta*, 544 F.2d 752, rehearing denied, 546 F.2d 906, rehearing denied, 582 F.2d 12 (5th Cir. 1977). Thus, we must determine what knowledge, if any, the owners of the Queeny had regarding the defective astern turbine and astern guardian valve at the time of the collision.

Difficulty with the operation of the astern guardian valve first surfaced in September, 1970, shortly after the Queeny was delivered to her owner. On her maiden voyage from Baltimore to Texas, the astern guardian valve malfunctioned by either sticking or jamming in the closed position. While in the closed position, steam is prevented from passing through to the astern turbine.

Normally, the valve is operated automatically by the limitorque motor. This motor provides torque to open or close the valve. The limitorque component of the valve limits the torque which can be applied by the motor. On the maiden voyage, the motor was incapable of moving the valve. Each time operation was attempted, the electrical circuit overloaded and the circuit breaker was tripped.

The astern guardian valve is equipped with a hand wheel which can be used to manually operate the valve. On the maiden voyage, the Queeny's Chief Engineer Breton attempted to turn the hand wheel, but was unable to do so. Eventually, Breton, with the assistance of Bethlehem Steel Guarantee Engineer Jensen, who also was aboard, was able to free the hand wheel by using a wrench which provided additional leverage. The wrench is referred to as a "cheater".

The use of the "cheater" enabled the engineers to apply excessive force to the hand wheel in order to break free the valve. The valve was jammed because the disc and the valve body, both of which were manufactured from the identical grade steel, had welded together. The application of the excessive force not only broke the weld, but also chiseled free pieces of metal from the disc and the valve body, which metal pieces were projected into the astern turbine by the passing steam. The metal pieces damaged the astern turbine blades.

The instruction manual for the astern guardian valve specifically states that a "cheater" should never been used on the handwheel. The manual also states, in a section entitled "Trouble–Shooting: Excessive handwheel effort can indicate the following: (a) improperly lubricated or damaged valve stem; (b) valve packing gland too tight; (c) improperly lubricated valve; (d) stem nut too tight on valve stem; (e) faulty or damaged valve parts".

Rather than investigate the cause of the jamming of the valve, Breton and Jensen reset the limitorque circuitry to allow the valve to open and close.

Keystone management was aware of the difficulties with the astern guardian valve as of September 14, 1970. On that date, Samuel Spencer, Technical Assistant to the Vice President of Keystone, routed an internal memorandum to Adolph B. Kurz, President of Keystone, informing Kurz of the outstanding problem with the astern guardian valve. Spencer also notified Bethlehem Steel, specifically, E. L. Insley, the Chief Guarantee Engineer, regarding the difficulties with the astern guardian valve.

As a result of Keystone's complaints about the valve, and Jensen's reports to Bethlehem, the valve was listed by Bethlehem as an item for repair at the guarantee yard dry docking after six months of operation. Three separate items involving the valve were ultimately included in the "Status of Guarantee Items" list dated March 23, 1971. They were: (a) B–34 Astern Guardian Valve won't close; (b) B–57 Astern Guardian Valve; and (c) B–154 Astern Guardian Valve bracket.

As part of Bethlehem's guarantee service program, it was arranged for Guarantee Engineer Robert McKendrick to meet the Queeny at New Haven, her first northern port, on September 20, 1970. However, McKendrick did not examine the valve nor did he take steps to determine the cause, scope or nature of the problem. When he met the Queeny, he was informed that the problem was rectified.

Consequently, McKendrick submitted his trip report with the notation that the valve problem was solved and Bethlehem marked items B–34 and B–57 as completed. Thus, when the Queeny entered the shipyard for guarantee period repairs in March, 1971, the astern guardian valve was not opened and no inspection was made. The cause of the jamming and sticking of the valve was not investigated.

The Queeny interests' failure to insist upon an inspection of the astern turbine and astern guardian valve during the guarantee period repairs is not excusable on the ground that they were informed that after adjustment of the limitorque circuitry, the

valve functioned properly. The clear warning contained in the instruction manual for the astern guardian valve "Trouble–Shooting" section placed the Queeny interests on notice of the possibility of damage to the valve. In view of this clear warning, it was incumbent upon the Queeny management to insist upon an adequate inspection during the guarantee period repairs.

Moreover, during the period of operation between the date of the sea trials and the date of the collision with the Corinthos, it was apparent that the astern turbine was not producing RPM levels in accordance with the specific commands given, and that the engine response time for orders for 60 RPM or greater, increased. These facts were readily ascertainable because the Queeny is equipped with a data logger system which records on a continuous graph every engine command and the shaft response.

However, Queeny management failed to review the graph tapes. Proper monitoring of the turbine's performance by review of the graph tapes would have revealed the deficiency in the turbine's performance. Queeny management, having notice of the difficulties with the astern guardian valve, should have monitored the performance of the astern turbine to determine if it was affected by the prior difficulties with the astern guardian valve.

Moreover, difficulty with the turbines of the SS Spirit of Liberty, a sistership of the Queeny operated by Keystone, should have placed the defendants on notice that there was a possibility of damage to the Queeny's turbine and astern guardian valve. Both the Queeny and the Spirit of Liberty contained astern guardian valves manufactured by The William Powell Company according to the same specifications, using non–hardened metals.

Extensive damage to the Spirit of Liberty's astern turbine was discovered in December, 1973, when the turbine was opened and inspected during her quadrennial survey. It is noteworthy that the damage suffered by the astern turbine of the Spirit of Liberty was very similar to the damage subsequently discovered on the Queeny.

The cause of the damage to the astern turbine of the Spirit of Liberty was not ascertained. The origin of the metal particles that damaged the turbine was not isolated. If proper procedure was followed for determining the cause of the damage, the failure of the astern guardian valve would have been discovered. Since Keystone receives reports from Bethlehem regarding repairs to its ships, they would have been alerted to the possibility of damage to the astern guardian valve on the Queeny when damage to the astern turbine of the Spirit of Liberty was reported.

Additional evidence combines with what has been recited to establish that Keystone negligently failed to monitor the performance of the Queeny's astern turbine.

In February, 1972, Keystone instructed all its Captains to perform turning circle tests and crash stop tests (emergency full astern). Though Captain Kellog performed turning circle tests, he refused to perform a crash stop test. He was apprehensive that such a test might damage the intricate and delicate propulsion system. By letter dated March 12, 1972, he expressed his fears to Keystone's Vice–President in charge of Operation, Chester Williams.

This letter clearly put Keystone on notice that the Queeny might be incapable of performing an important safety maneuver. Keystone, however, took no measures to determine the nature of Captain Kellog's fears.

If Keystone had been reviewing the graph tapes they would have discovered the problems associated with the functioning of the astern turbine. With such information in hand, the reason for Captain Kellog's refusal to perform the crash stop test would have been manifest.

The evidence referred to in this section of our opinion clearly indicates that the Queeny's shoreside management was aware, or was negligent in not being aware, of the vessel's unseaworthiness. The unseaworthy conditions referred to were contributing causes of the collision.

Based upon the legal precedent set forth in Section III of our opinion, we conclude that the Queeny interests are not entitled to limit their liability.

## IX

■ Our conclusion regarding the Queeny interests' petition does not complete our inquiry. Also before us is the petition of the Corinthos interests for exoneration from and limitation of liability. The issue presented derives from the Queeny interests' contentions that the Corinthos was at fault for not inerting her tanks and that BP/Sohio were negligent in failing to have a shore–based inert gas system to be used during discharge of crude cargo.

After careful review of the Queeny interests' contentions, and review of the trial testimony, exhibits and all other supporting evidence, we have concluded that the absence of inerting systems was a contributing cause of the damages. For the following reasons, however, we shall not deny the petition of the Corinthos–BP/Sohio interests for exoneration from liability.

In an uninerted tanker, two of the three elements necessary for combustion are present; fuel, in the form of vapor from the cargo, and oxygen, drawn into the tanks during the discharging operations. The third element necessary for combustion is an ignition source.

An inert flue gas system removes oxygen from the tanks of crude carriers, rendering combustion dependent upon the simultaneous injection of two outside elements; oxygen plus an ignition source.

The system utilizes flue gas, manufactured as a by–product from combustion taking place in the vessel's own boilers. After the gas is cleaned it is pumped into the cargo tanks to displace the vapor and oxygen in the tanks, replacing it with an inert gas.

The Corinthos was not fitted with an inert gas system at the time of her construction, in 1963, nor had she been retrofitted prior to the collision.

The concept of inerting is not new. As early as 1925, Chevron inerted some of its ships. Chevron's lead was followed by Sun Oil, who in 1932, began inerting as a result of an explosion in one of its vessels. Sun Oil inerted ships as small as 16,000 tons. BP Ltd., the parent company of BP/Sohio, has been inerting ships since 1963. Her owners and operators were aware that she was not inerted. However, as early as 1972, the owners and operators had vessels constructed with inert gas systems, and in 1975, about the time of the collision, they retrofitted a vessel with an inert gas system.

The thrust of the Corinthos interests' argument is that at the time the Corinthos was built (1963) and as late as the time of the collision (1975), there was no requirement, either national or international, that a vessel the size of Corinthos be fitted with an inert gas system. In addition they contend that the explosions which followed the collision would not have been prevented by an inert gas system because the Corinthos' tanks were breached upon the collision, which would have allowed the escape of any inert gas, and the introduction of oxygen.

BP/Sohio contend that the Queeny interests' argument places them in the untenable position of either providing a shore based inert gas system for uninerted tankers, or refusing to allow such tankers to discharge their cargo. They claim that the technology for the shoreside inerting of tankers is not available, and since only a very small percentage of the world's tankers were inerted at the time of the collision, if the Court accepts the Queeny interests' position, BP/Sohio would be forced to cease operations because they would be unable to receive crude for refining.

With regard to the position of the Corinthos interests, we shall grant the petition for exoneration. We reach this decision reluctantly, and despite our strong predilection to deny the petition. In the absence of recently enacted legislation which sets forth the time frame for the retrofitting of varying size crude carriers with an inert gas system, we would hold that the Corinthos was unseaworthy at the time of the collision. *See,* The Port and Tanker Safety Act

of 1978, ·Pub.L.No.95–474, 92 Stat. 1471 (codified at 33 U.S.C. §§ 1221–1232; 46 U.S.C. §§ 214, 391a).

Though in 1975, no law required the inerting of cargo tanks on vessels the size of the Corinthos, we believe that at that time, the custom of the industry was insufficient to satisfy common law standards of care. However, the Corinthos interests are fortunate that Congress has entered this field of law, thereby preempting the Courts from deciding this issue.

Under the time sequence contemplated by Congress, vessels the size and age of the Corinthos need not be retrofitted with an inert gas system until May 31, 1983. Congress determined to grant a grace period because of possible ramifications if it acted unilaterally in an area effecting international commerce. Congress chose instead to defer to the schedule and requirements established by the International Maritime Consultative Organization (IMCO).[4]

Though we must defer to the wisdom of Congress, which reached its conclusions only after extensive deliberation on the matter, we feel we would be remiss if we did not express the following thoughts.

The importance of an inert gas system must not be minimized. The instant collision resulted in the loss of 26 lives and numerous other personal injuries. If such tragedies can be prevented by the utilization of an inert gas system, we strongly urge vessel owners and operators to take every feasible step to comply with the adopted legislation prior to the effective date.

We believe the shipping industry has anchored itself to a position which does not meet common law standard of care requirements. Justifications based upon cost, feasibility, and effectiveness are not acceptable.

Moreover, we have reservations whether efficacy serves as an explanation. The expert testimony elicited at trial by both the Queeny and Corinthos interests established

beyond question that the risk of explosion or fire is greatly reduced or completely removed when an inert gas system is utilized.

The experts stated that an uninerted tanker which has discharged its cargo of crude has been likened to a floating time bomb. They explained that the enormous build–up of the fuel vapor coupled with the introduction of oxygen results in a circumstance ripe for explosion upon the introduction of an ignition source. By inerting the tanks of crude cargo ships, the highly flammable condition does not develop.

Expert testimony established that even upon the breaching of the cargo tanks, an explosion would not occur. Since a combustible mixture of oxygen and fuel vapor must be present for an explosion to occur upon the introduction of an ignition source, the atmosphere in an inerted tank will not be susceptible to explosion until after the inert gas is replaced by oxygen. In view of the size of the puncture in the Corinthos' tanks, and the fact that additional inert gas may be pumped into the tanks as needed to maintain a non–combustible mixture, oxygen would not have been introduced at such a rapid rate as to instanteously create a dangerous vapor mixture.

We take judicial notice of the fact that few cases have brought this issue to fruition because of the industry's policy of avoiding said issue in those few cases which are not settled.

One case in this circuit, however, did address the issue. In the case of the *Petition of Oskar Tiedemann and Co., (Elna II/Mission San Francisco)*, 179 F.Supp. 227 (D.Del. 1959), *Aff'd*, 289 F.2d 237 (3d Cir. 1961), the court determined that the Mission San Francisco was unseaworthy. Its owners were denied both exoneration from and limitation of liability because the vessel was not equipped with a method to relieve the highly combustible atmosphere in the tanks caused by the discharge of jet fuel. That court discussed both butterworthing and

---

4. Congress modified the IMCO Protocols in certain respects, inter alia, by requiring the retrofitting of inert gas systems on older crude carriers of over 20,000 Dead Weight Tons (DWT) versus 40,000 DWT, and by phasing in the requirement on older carriers effective May 31, 1983.

the use of a flue gas system as acceptable methods for relieving the highly combustible condition created in tanks after discharge of crude.

Clearly, if Congress had not preempted this field the law of this circuit would require us to deny the petition of the Corinthos interests for exoneration from or limitation of liability.

Next, we must determine whether BP/Sohio were negligent in failing to have a shore–based inert gas system to be used during discharge or in allowing an uninerted vessel to dock at its pier.

Above, we discussed the mechanics of a flue gas system. The system prevents oxygen from mixing with fuel vapor in cargo tanks. It requires the manufacture of an inert gas which gas then is introduced into the cargo tanks. The inert gas can be manufactured either as a by–product of the fuel burned by the vessel or at a shore–based discharge facility.

Though the available technology for the construction and development of a shipboard system exceeds that for a shore–based facility, many of the principles are the same. With a shore–based system, the inert gas must be pumped to the vessel via a hose connection and then directed to the cargo tanks in much the same manner, through the same piping system, as if the inerting was done by a shipboard system.

Not only do BP/Sohio dispute the feasibility of a shore–based system but also they contend that utilization of a shore–based system would be ineffective once a vessel was underway, because cargo tanks breathe, which would allow the inert gas to leak out.

Though we agree that a ship based system has many advantages, we believe that due to the highly dangerous nature of this activity, every reasonable safety precaution must be taken to minimize the possibility of explosion.

In the absence of recently enacted legislation, we would not hear BP/Sohio to complain that it would be overly burdensome to require them to provide a shore–based inerting system for non–inerted ships or to turn away non–inerted ships. We are not familiar with any rule of law which would allow a party to successfully defend itself against a claim of negligence or contributory negligence, on the ground that in an effort to save time and money and to avoid a burdensome task it did not undertake the reasonable precautions dictated by the nature of the activity.

Moreover, the fact that a shore–based system may be ineffective once a vessel is underway is irrelevant to the duty of care imposed upon the owners of a crude oil discharge facility. BP/Sohio need not concern themselves with what might happen once a vessel is underway.

However, because Congress has expressed a sensitivity to the practical issues involved in revamping the shipping industry's practice of not inerting crude carriers, we shall be equally accommodative, and not hold BP/Sohio partially responsible for this disaster.