In re the Complaint of Robert A. TITTLE for exoneration from or limitation of liability as the owner of the M/V ADIOS, Plaintiff-Appellee,

v.

Nicholas ALDACOSTA and Brenda Aldacosta, Defendants Third-Party Plaintiffs-Appellants,

v.

Mike TITTLE, Third-Party Defendant Cross Plaintiff-Appellee,

v.

NORTHWESTERN NATIONAL INSURANCE CO., Cross Defendant.

No. 75–1119.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

Rehearing and Rehearing En Banc Denied Jan. 31, 1977.

Edward A. Perse, J. Arthur Hawkesworth, Jr., Miami, Fla., for defendants third-party plaintiffs-appellants.

Mercer K. Clarke, Miami, Fla., for Robert A. Tittle.

Before BROWN, Chief Judge, and TUTTLE and GEE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Brenda Aldacosta fell as she was disembarking from the M/V ADIOS, a charter boat owned and captained by Robert Tittle (Owner). She sustained severe injuries which included the complete loss of one kidney. Owner under the shipowner's limitation of liability statute 46 U.S.C. § 183 [1] is seeking a judgment of exoneration from

---

1. *§ 183. Amount of liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel"*

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

liability or in the alternative to have his liability limited to the value of the vessel at the time of the injury. The Aldacostas filed a claim for their personal injury damages.[2]

The case was tried without a jury. See F.R.Civ.P. 38(e). The lower court made its findings of facts and conclusions of law and entered judgment exonerating Owner from all liability and dismissing the damage claim and all the counter claims and third party claims. It concluded that neither Captain Tittle nor anyone acting on his behalf was negligent nor committed any acts which proximately caused the injury to Brenda. Having granted exoneration the Court nevertheless went on to hold that the occurrence was without the privity and knowledge of the owner-captain then on board and in command.

We reverse.

### The Standard Of Review

■ As in other cases, on appeal in admiralty the holding of the lower court is judged by the standard set in F.R.Civ.P. 52(a) which provides that findings of fact "shall not be set aside unless clearly erroneous." *McAllister v. U. S.,* 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; *Davis v. Parkhill-Goodloe Co. Inc.,* 5 Cir., 1962, 302 F.2d 489; *Noah's Ark v. Bentley & Felton Corp.,* 5 Cir., 1961, 292 F.2d 437. Recognizing as we long have that our role is quite different from reviewing a jury verdict with its Seventh Amendment strictures, *Boeing v. Shipman,* 5 Cir., 1969, 411 F.2d 365, if the Court is of the strong impression that the findings are against the truth and right of the case so that an injustice has been wrought, the reviewing court is not bound and the vulnerable findings may, and should be set aside. *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; *Sanders v. Leech,* 5 Cir., 1946, 158 F.2d 486; *Galena Oaks v. Scofield,* 5 Cir., 1954, 218 F.2d 217; *United Geophysical Co. Ins. v.*

*Vela,* 5 Cir., 1956, 231 F.2d 816. Wright & Miller, Federal Practice and Procedure, Vol. 9 § 2585 p. 731 (1971).

### Slip From Deck To Dock

Although we reject as clearly erroneous the Trial Court's decisive finding—conclusion that there was no negligence on the part of Owner, the crew or the vessel we substantially paraphrase its findings with respect to sitting and the occurrence.

The Aldacostas (with their infant child) and another individual, June Thacker, had spent the day of November 6, 1973 aboard M/V ADIOS for sport fishing. The vessel returned to the dock that afternoon. M/V ADIOS was constructed of fiberglass over plywood with the fiberglass being painted with marine paint. Under Owner's practice the mate was to continuously wash the vessel down during the day to keep it clean and remove fish slime and other debris which might cause hazardous footing on the walking surfaces of the vessel. The painted fiberglass when dry formed a smooth, non-slippery surface. When wet, the painted fiberglass was a slightly more slippery surface. Owner had established a procedure under which the mate was to place a towel on the transom to provide a non-skid surface for persons embarking and disembarking by stepping on the transom. In addition to putting the towel in place the mate was to stand on the transom and assist individuals. This procedure was known to the mate and complied with by him on many prior occasions.

Because of the difficulty of keeping permanent non-skid materials clean in the presence of fish slime walking surfaces would often be more slippery with non-skid materials than without non-skid materials. During the last fifteen minutes of the movement back to the dock, the mate wiped down the entire cockpit area including the transom with a damp towel. Significantly, the Court found that when "the vessel arrived

---

**2.** The Aldacostas also sued Mike Tittle, Owner's brother and mate. Mike Tittle cross claimed against Northwestern Insurance Co. for indemnity. The Aldacostas filed counter-claims against Northwestern alleging that it was in fact the real party in interest since they insured Robert Tittle and the ADIOS.

at the dock, the transom was either dry or slightly damp but not what could be termed 'wet' ". The vessel was docked stern first with a stern approximately 18 inches from the dock after all lines were made fast. With Owner on the flying bridge the mate began tying off the stern lines. During this time Nicholas Aldacosta and June Thacker disembarked by standing on the transom then stepping down to the dock. Neither Owner nor mate were. aware the passengers had left. The mate, however now aware of this, saw Brenda Aldacosta approaching the fish box and the transom area with the apparent purpose of leaving the vessel unassisted. The mate immediately stepped up on the transom to assist Brenda. Again, significantly, the Court found the mate "did not have time to procure the towel and put it in place prior to her standing up on the transom".

Brenda who was barefoot and holding wooden sole shoes in her left hand was standing toward the middle of the transom. The step down to the dock was approximately 12 to 18 inches. Despite the mate's assistance Brenda missed the dock with her foot and fell forward striking her side in the area of her right kidney sharply against the edge of the dock.

While all this was taking place Owner was busy on the flying bridge shutting down the console and was personally unaware that Brenda was disembarking from the vessel and that the towel had not been put in place.

The Trial Court concluded that although "customarily a towel was placed on the transom . . . the failure to place the towel over the transom in this instance did not result from fault on the part of [Owner] or the mate, but rather to the haste of the guests in disembarking from the vessel before the vessel was completely secured." He then went on to find that even so "the absence of this towel was not . . . a contributing factor since the transom was in any event dry or virtually so and consequently not unreasonably slippery".

### Exoneration

■ Under this standard for the order of exoneration to survive appellate review Owner, his vessel and crew must be shown to have been free from fault.[3]

■ The lower court found that the duty owed by Owner was one of ordinary care— to establish and maintain a reasonably safe means of ingress and egress onto and from the vessel. Although we have pointed out the curious anomoly that a bag of coffee beans fares better than a non-crew member fare paying passenger to whom the warranty of seaworthiness does not run, *Gibboney v. Wright*, 5 Cir., 1975, 517 F.2d 1054, we agree, as do the parties, on this controlling standard. But we do not accept the finding of the lower court that under the controlling facts Owner met his duty on this occasion.

■ By his own testimony Owner established that 100% of the charter fishing boats used some precaution for preventing accidents like Brenda's. On his own story one or more of five protective devices were used to prevent skids—rubber mats, chrome with rubber, teak strips, tarpaulins or towels. The method he selected was towels.

Affirming the importance in his own mind of this protective procedure Owner emphasized that the mate was given positive instructions to carry it out. So important was it that he had repeatedly told his mate to put down a damp towel for the passengers to step onto when leaving the boat. The towel normally was put in place while the boat was coming in to the dock. Then, after docking, either the mate or the captain would take hold of the passengers' arm or hand to steady them while disembarking. Not only that, the procedure, as the Judge expressly found, "had been carried out on numerous previous occasions." Vol. 1 Record at 462.

---

**3.** The Court made no finding of contributory fault, nor could it upon our analysis of the critical fact.

But the fact remains that the mate did not put down the towel as instructed. That he was engaged in securing the lines or that two passengers (and the infant) had already gotten onto the dock, did not relieve him of the duty of carrying out the command. This is especially true since, on realizing that the two were on the dock, he saw Brenda walking toward the stern with the obvious purpose of disembarking—a subjective conclusion almost simultaneously manifested by his holding her arm. There is no suggestion permissible that things prevented him from then placing the towel on the transom before permitting Brenda to continue the mate-assisted step out and down. All the while, of course, as the Judge found, "the transom was . . . slightly damp" but not, he continued, "what could be termed 'wet' ".[4] Vol. 1 Record at 459. On his own industry-wide self-imposed standard of care, *June T., Inc. v. King*, 5 Cir., 1961, 290 F.2d 404; *Schlichter v. Port Arthur Towing Co.*, 5 Cir., 1961, 288 F.2d 801, we cannot accept under 52(a) the conclusion that the absence of the precautionary towel was not negligent or a substantial contributory cause.

### Limitation Of Liability

■ A denial of exoneration does not necessarily preclude a grant of limitation of liability. Exoneration is contingent upon a finding of no contributory fault. Where liability is found, as it is by our reversal, the owner bears the burden of proving that it was without his privity or knowledge. When the owner's lack of privity and knowledge is established, recovery is limited to the value of the vessel, its pending freight, etc.

■ Ordinarily this is to afford protection to the physically remote owner who, after the ship breaks ground, has no effective control over his water-borne servants. Thus the errors in navigation or other negligence by master or crew are not attributa-

ble to him on respondeat superior for limitation purposes. In the typical situation of a corporate owned ocean vessel the privity and knowledge scrutiny focuses in on whether the shore-based high-leveled management is aware (or should have been) of the likelihood of the occurrence happening after the ship is underweigh. See, e. g., *Farrell v. Jones*, 5 Cir., 1976, 530 F.2d 7 (limitation allowed) and *Avera v. Florida Towing Corp.*, 5 Cir., 1963, 322 F.2d 155 (limitation denied).

■ The plight of the owner-present obviously calls for closer scrutiny. Unlike owners who are remote physically and operationally, he cannot rightfully claim that his investment in a seagoing enterprise [5] is imperiled by actions of those over whom he can exercise no immediate control. His burden is a heavy one then in meeting the congressional policy goals, although of course pleasure vessels and sporting charter vessels may well qualify as "seagoing vessels" 46 U.S.C. § 183(f).

Where the physical cause of the casualty is one as to which the owner on board has no real knowledge or means of knowledge his presence does not deny him the right to limitation. See *Gibboney v. Wright, supra* ; and *Yacht Meridian (Pennell's case)*, 1967 A.M.C. 645, USDC S.D.Fla. by then Chief District Judge Dyer (each unseaworthiness of the vessel). But where the operational command of the whole enterprise is in the hands of the owner then present, he is charged with privity and knowledge on usual principles for the negligent acts of those under his effective command. See *Petition of Phil Davis*, 1950 A.M.C. 1028; USDC N.D.Cal., (owner of pleasure boat who was in control of it and operating it at the time of an accident had no right to limit liability); *King v. Liotti*, 1948 A.M.C. 476, N.Y. (owner and operator of motor boat may not limit liability in collision with rowboat); *Petition of W & H Wheel Service, Inc.*, 1955 A.M.C. 1017, 6 Cir., C.A. (limitation denied

---

4. The Court earlier found that ". . . painted fiberglass when dry formed a non-slippery surface. When wet, the painted fiberglass was a slightly more slippery surface."

5. See Vol. 3 Benedict on Admiralty, Limitation of Liability, Ch. 5, p. 5–1.

 

where the president, manager and principal stockholder—one person—was aboard and in charge of navigation at the time of the accident); *Petition of Lewis H. Follett and Nora B. Follett*, 1959 A.M.C. 258, USDC S.D.Tex. (the owner who operates his own pleasure craft is not entitled to limit liability); and *Yacht Hedo*, 1969 A.M.C. 1180, USDC E.D.Va. (knowledge and privity are much nearer at hand in the case of a pleasure craft than in the impersonal relationship of an investor-owner to a seldom seen cargo vessel.

On the circumstances of this case Owner cannot immunize himself from derivative liability since he was on board, conned the vessel, and had himself devised the plan which was not carried into effect by one over whom he exercised direct command.[6]

### Valuation

In view of our holding that there was liability and no right of Owner to limit we do not reach the question of the value of M/V ADIOS fixed by the Court or the method of fixing it. •

REVERSED and RENDERED.

GEE, Circuit Judge (dissenting):

The court below, which heard the witnesses, observed their demeanor, etc., found, on ample evidence both ways, that the transom in question was dry or virtually so and not unreasonably slippery. The majority does not find otherwise.[1] The court below found that Mrs. Aldacosta simply "missed the dock with her foot," though the mate was holding her arm to help her off. It did not find that she slipped, nor do we: "Despite the mate's assistance Brenda [Mrs. Aldacosta] missed the dock with her foot and fell . . . ."[2]

No one has yet found that Mrs. Aldacosta slipped. Until someone does, the absent towel bears no more causal relation to her injury than the absence of running lights. Baffled by such reasoning, I dissent.

---

**6.** Owner has cited *Blackler v. Jacobus*, 2 Cir., 1957, 243 F.2d 733, for the proposition that the owner's mere presence on board does not of itself bar limitation. Besides being a decision wholly on requirements of pleadings, we have considerable doubt that the conclusion squares with the general principles on complicity in the event as the test for privity, we find it unnecessary to credit further since on our analysis and

Owner's duty as captain in charge of all that was, or had to be, going on was more than mere presence here.

**1.** Indeed, to divine a board's degree of wetness from a dry record would be a striking appellate feat.

