MEMORANDUM DECISION AND ORDER
 

 NANGLE, District Judge.
 

 A. Background
 

 The petitioners
 
 [1]
 
 in the above-captioned case have filed a petition for Exoneration from or Limitation of Liability, pursuant to the Limitation of Liability Act, 46 U.S.C.App. §§ 183-89. The petitioners seek to limit the liability that they have incurred as a result of a massive vessel casualty that occurred on December 30, 1997, causing the loss and damage of over $10 million worth of steel mill products owned by the claimants.
 

 Throughout 1998, the claimants filed separate actions in this Court and in the Southern District of New York, seeking recovery for over $11 million worth of lost or damaged cargo. All of the cases, including the instant petition for exoneration/limitation of liability, were then trans
 
 *1315
 
 ferred to this Court. The cases were consolidated on May 28, 1999.
 
 See
 
 Order dated May 28, 1999 (Doc. 64). With regard to the petition for limitation of liability, this Court bifurcated the action on the issues of liability and damages.
 

 The “limitation of liability” portion of the case came before the Court for a bench trial, prior to which trial, joint stipulations of fact were filed by the parties, which the Court has adopted. Consolidated Pretrial Order, Dec. 30,1999 (Doc. 71) (hereinafter, individual stipulations from this document are designated as “Stip._”). The issue is whether the petitioners are entitled to limit their liability in the case. At the Court’s direction, attorneys filed post-trial briefs with proposed findings of fact and conclusions of law. Having carefully reviewed these post-trial documents, together with the pleadings, the testimony of the witnesses, the exhibits before the Court and the stipulations of the parties, the Court makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52.
 

 B. Findings of Fact
 

 The Voyage
 

 1. On December 19, 1997, the MTV MERCHANT PATRIOT departed from Praia Mole, Brazil en route to Savannah, Georgia. The vessel was transporting a cargo of steel products and part of a knocked-down steel mill. (Stip.9, 10, 61).
 

 2. The first ten days of the voyage were uneventful, but on the evening of December 29, 1997, members of the crew discovered that seawater was flooding the engine room. The crew determined that the source of the water was a failed pipe in the seawater circulating system. (Stip.62, 66, 69).
 

 3. The failed pipe was a 150mm pipe leading from the 300mm aluminum brass pipe (T joint) to the forward fire, bilge, and ballast pump. The 150mm pipe ruptured near the flange and was leaking. The pipe itself was below the surface of the seawater that had leaked into the engine room. (Stip.69).
 

 4. In order to patch the failed pipe, members of the crew shut down the main engine for approximately forty-five minutes. During that time, the ship was unable to steer or make headway and therefore could not maneuver to minimize the effects of the wind and the sea. As a result, some of the cargo began to shift. (Stip.70, 72).
 

 5. Members of the crew secured a temporary patch on the pipe, and the main engine was restarted. However, at approximately 7:00 a.m. on the next morning, December 30, 1997, the patched pipe again ruptured. (Stip.73).
 

 6. As a result of this rupture, seawater entered the lube oil sump for the main engine, affecting the viscosity of the lube oil. This contamination caused the main engine to shut down again, and the crew was unable to get the engine restarted. (Stip.75).
 

 7. As had occurred the evening before, cargo began shifting when the main engine was shut down for a second time. At approximately 8:20 a.m., the Captain ordered the crew to abandon the vessel, and they were rescued by the Coast Guard. (Stip.76).
 

 8. Smit Americas, Inc., a salvor, was hired to recover the M/V MERCHANT PATRIOT. By the time the salvors found the vessel, a significant portion of the deck cargo had been lost overboard or damaged. The salvors towed the vessel to Freeport, in the Bahamas, where she was dewatered and destabilized. In March 1998, the vessel was towed to Charleston, South Carolina, where all of the remaining cargo was discharged. The vessel was eventually salvaged. (Stip. 78, 79; Claimants’ Ex. OOO p. 4).
 

 The Parties
 

 9. Cenargo Navigation Ltd (“Cenar-go”) purchased the M/V MERCHANT PATRIOT in February 1988. Cenargo was the owner and operator of the vessel since
 
 *1316
 
 the time of the purchase and through the completion of the voyage at issue. (Stip.4).
 

 10. Mr. Michael Hendry is the principal of Cenargo, and he was the primary contact person for the MTV MERCHANT PATRIOT. (Stip 4).
 

 11. On March 7, 1989, Cenargo transferred management of the M/V MERCHANT PATRIOT to V Ships (UK) Ltd. (“V Ships”). V Ships managed the vessel at the time of the casualty. V Ships also managed several other vessels owned by Cenargo. (Stip.5).
 

 12. At the time of the voyage at issue, Cenargo and V Ships did not have a written management agreement in place with respect to the management of the M/V MERCHANT PATRIOT, and no written Management Agreement was in place for most of the time since 1989. (Stip.5).
 

 13. Although there was no written management agreement in place at the time of the casualty, both Cenargo and V Ships understood that an agreement did in fact exist. (Trial testimony of Hendry).
 

 14. V Ships hired and managed the crew of the M/V MERCHANT PATRIOT, acting as an agent for Cenargo. V Ships operated on an annual budget, subject to the approval of Mr. Hendry, the principal of Cenargo. Cenargo paid the expenses for ship operation and maintenance, including crew wages. Cenargo also paid V Ships a management fee. (Trial testimony of Hendry, Rosseter).
 

 15. V Ships oversaw the maintenance of the vessel. With regard to that responsibility, as well as all others, V Ships operated as an agent of Cenargo. (Trial testimony of Hendry, Rosseter).
 

 16. V Ships and Cenargo are independent companies. V Ships did not have any ownership or financial interest in the M/V MERCHANT PATRIOT. V Ships was not a charterer of the vessel and was not involved in the commercial aspects of which ports the vessel called at and what cargoes she carried. (Stip.19.)
 

 The Vessel
 

 17. The M/V MERCHANT PATRIOT, a general cargo vessel, was built by Scotts Shipbuilding Company, Ltd, Greenock, Scotland in 1980. The vessel was built under the supervision and approval of Lloyd’s Register of Shipping, and she has been classed with Lloyd’s since she entered service. (Stip.ll).
 

 18. The vessel was 540 feet in length and weighed 16,482 gross tons. She had five holds, all forward of the accommodation house. (Stip.ll).
 

 19. The vessel had a main engine and three auxiliary engines. All four of those engines were cooled by seawater passing through the seawater circulating system. (Stip.12,14).
 

 20. The seawater circulating system was a critical system on the M/V MERCHANT PATRIOT, as it is on any vessel. (Stip.14).
 

 21. The following is a description of the seawater circulating system on the vessel:
 

 There were high and low sea chests on the port and starboard side of the vessel where sea valves controlled the entry of seawater into the seawater circulating system. The sea chests were connected by a nonferrous 450mm pipe, which was made of aluminum brass. The water that entered the circulating system was moved through the piping network by the main seawater pump. (Stip.14).
 

 On the port side of the vessel, a 300mm aluminum brass pipe was connected to the transverse 450mm pipe by flanges and it ran aft (longitudinally) along the port side of the vessel, between the main engine and the side (skin) of the ship. A similar pipe ran aft along the starboard side of the ship. (Stip.14).
 

 The 300mm pipe on the port side had two T joints branching off of it toward the skin of the ship. These T joints were made up of a short section of 150mm aluminum brass pipe and flanges. These T
 
 *1317
 
 joints were connected by another flange to ferrous, carbon steel 150mm pipes, which continued (in several sections) toward the outboard, port side of the ship. The steel pipe leading from the forward T joint was connected to the fire, bilge and ballast pump, sometimes referred to as the forward fire, bilge pump. (The section of pipe that failed during the voyage at issue was the first section leading from the T joint toward the pump, and the failure occurred adjacent to the T joint flange.) The steel pipe leading from the aft T joint was connected to the fire, bilge and general service pump, sometimes referred to as the aft fire, bilge pump. The steel pipes running from the forward and aft T joints to the pumps were within three feet of each other. (Stip.14).
 

 Part of the 150mm piping for the seawater circulating system, including that leading to the forward and aft pumps, was located below the floor plates in the engine room, approximately two feet above the tank tops. The pipes could be viewed and inspected either by standing on the tank tops or leaning over and looking under the floor plates. One could also inspect the piping by lifting up the floor plates that composed the walkway. Photographs taken by surveyors following the casualty indicate that the pipes are visible as noted. (Stip.14).
 

 There were valves at the forward pump and the aft pump that prevented the seawater in the circulating system from proceeding any further, unless the pumps were in operation in one of their modes (i.e., fire, bilge, ballast, or general service). Whenever the main engine and/or auxiliary engines were running, the seawater circulating system had to be operating for purposes of cooling, and there was seawater in the pipes leading to the forward and aft pumps. Given this configuration, in order to replace or renew these pipes, it was necessary to close the sea valves and shut down the main engine and the auxiliary engines. (Stip.15).
 

 22. The engine room had two bilge wells forward, one on the port side and one on the starboard side, and one larger bilge well aft, along the centerline. Each bilge well had a float activated bilge alarm system that, if functioning properly, would cause an alarm to sound when water reached certain levels in the bilge wells. The high level (flooding) alarm activated when the height of the water was at the top of the bilge well and was about to flood the engine room. This high level alarm was integrated for the three bilge wells. Whenever a bilge alarm activated, an engineer was required to record the alarm in the General Alarm Log. (Stip.17).
 

 23. The deck of the M/V MERCHANT PATRIOT was fitted to carry cargo. There were lashing points known as D rings configured around the hatch covers. The D rings were made of steel. (Stip.18).
 

 Maintenance of the Vessel
 

 24. As manager, V Ships oversaw the maintenance of the M/V MERCHANT PATRIOT. (Stip. 19; Trial testimony of Hendry).
 

 25. V Ships would draft annual budgets projecting the maintenance and operating costs and present them to Cenargo. (Stip. 19; Trial testimony of Hendry).
 

 26. Mr. Hendry was the primary contact person for Cenargo, and he spoke with V Ships personnel about the vessels frequently during any given day. (Stip. 19; Trial testimony of Hendry).
 

 27. Mr. Hendry was in charge of reviewing and approving the budget prepared by V Ships for the operation and management of the Cenargo vessels, including the M/V MERCHANT PATRIOT. On at least a quarterly basis, Hendry would meet with certain V Ships directors, including Jerry Lees (Managing Director of V Ships) and Stephen Rossetfer (Operations Director of V Ships), in order to review the status of the ships and the proposed budget for maintenance, etc. The group would also review the condition
 
 *1318
 
 of each vessel. (Stip. 19; Trial testimony of Hendry).
 

 28. V Ships provided Cenargo with several types of reports pertaining to the condition of the vessels, including Quarterly Reports, Inspection Reports, Drydock reports and photographs taken of the vessels during inspections. Additionally, Hendry, who described himself as a “hands-on owner,” would personally attend the vessels and perform his own inspections. (Stip. 19-22; Trial testimony of Hendry; Lees Dep. at 21).
 

 29. V Ships performed its functions through what it referred to as a Safety and Quality Management System. This System was based on a series of manuals setting forth policies and procedures that were to be followed and forms that were to be completed and submitted to the V Ships office. (Claimants’ Exs. D — K). The System specified that the maintenance of the vessels under management was to be a joint effort by the ship staff and the V Ships office personnel. (Stip. 21; Trial testimony of Hendry; Trial testimony of Rosseter; Claimants’ Ex. G § 10-Mainte-nance).
 

 30. The ship staff and V Ships Fleet Superintendents were to conduct periodic inspections of the vessel’s structure and systems, including the engine room piping. They were then supposed to record the findings on V Ships Inspection Report (OP3) forms. (Stip.22).
 

 31. The System also required that the officers prepare a set of Handover Notes at the end of their tour, in order to apprise the relieving officer of the status of the vessel. The Notes were then forwarded to V Ships. (Stip. 24; Claimants’ Ex. T).
 

 32. When V Ships began managing the M/V MERCHANT PATRIOT in March 1989, a V Ships Fleet Superintendent performed an inspection' of the vessel. The Superintendent indicated in his Handover Report that, during his inspection of the engine room piping, a section of the 150mm pipe leading to the fire and bilge pump “collapsed” at the flange connection to the T joint leading to the 300mm aluminum brass pipe. The collapse was due to galvanic corrosion near the flange, where the ferrous, carbon steel pipe was connected to the non-ferrous, aluminum brass pipe. That pipe was leading to the aft pump; notably, the location was the same as that of the failed pipe in this case, except here the section that failed was leading to the forward pump. This report was provided to Cenargo. (Stip. 27; Claimants’ Ex. R, p. 2, 6, 8; Trial testimony of Hendry).
 

 33. In April 1989, a V Ships Fleet Superintendent performed another inspection of the vessel and found another section of seawater suction pipe that needed to be renewed. He commented that this “was the second major pipe renewal” in two months and that more pipe renewals could be expected. (Claimants’ Ex. S, p. 6; Trial testimony of Hendry).
 

 34. In June 1994, Jack McNeil, then Chief Engineer of the vessel, prepared a set of Handover Notes and reported that he had prepared a, list of pipes to be renewed during the July drydocking at Hamburg, Germany. He indicated in his Notes that Mukund, the responsible V Ships Fleet Superintendent, deleted the requests from the drydock list. (Stip.29, 30)
 

 35. The Drydock Report for the Hamburg drydocking in July 1994 did not list any renewal work for either the 150mm pipe leading to the forward fire, bilge, and ballast pump or the 150mm pipe leading to the aft fire, bilge, and general service pump (Stip. 31; Claimants’ Ex. U).
 

 36. In September 1994, shortly after the M/V MERCHANT PATRIOT came out of the Hamburg drydock, the new Chief Engineer, Walter Muir prepared a Drydock Work List. This list indicated that the 150mm pipe leading to the aft fire, bilge, and general service pump was eroded and that it had a patch fitted. Chief Engineer Muir referred to the engine
 
 *1319
 
 room piping at the tank top level and noted the following: “because a section of pipe being badly holed, i.e., Job E-l, a reminder of the Lloyds surveyors comments at drydock that he thought they were in a very poor condition.” (Stip. 32; Claimants’ Ex. V).
 

 37. Hendry stated that a patch on a pipe should raise an interest in checking the condition of adjacent pipes and pipes that are similarly situated. (Stip.33).
 

 38. Mr. Rosseter stated that a pipe that has been patched should be renewed as soon as possible, particularly if it is part of a critical system. (Stip.34).
 

 39. The September 1994 Inspection Report noted the repair and stated “Recently have repaired a badly holed section of fire pump fine and other pipes under floor plates are badly corroded externally.” There is no indication that those pipes were ever renewed. (Claimants’ Ex. X; Stip. 25).
 

 40. None of the OP3 reports submitted by the ship’s staff or V Ships personnel from 1989 through December 1997, recommended renewal or repair of any section of the failed 150mm pipe at issue in this case. (Stip.25).
 

 41. Cenargo and V Ships have produced no documents indicating that from 1989 onward, any entity ever renewed the 150mm line leading to the forward pump (the failed pipe). (Stip.28).
 

 42. Neither Cenargo nor V Ships have produced any records indicating that from 1989 onward, any of the 150mm pipes in the engine room seawater piping system have been repaired, replaced or ordered. (Stip.25).
 

 43. In March 1996, V Ships Insurance Manager distributed a Special Report from the Standard P
 
 &
 
 I Club titled
 
 “Pipe Corrosion-The Hidden Danger.”
 
 The manager directed the memo to the vessels under V Ships management, as well as to Mr. Lees (the managing director), Mr. Rosseter (the Operations Director), the Fleet Managers and Superintendents, including Mr. Mukund and Mr. Hewitt; and Cenargo. (Claimants’ Ex. MM; Trial testimony of Hewitt).
 

 44. The special report discussed in great detail the dangers presented by corrosion of seawater piping. Specifically; the report discusses the effects of galvanic corrosion, which occurs when two dissimilar metals are joined as in the instant case (aluminum joined with carbon steel piping). The article stressed the need to improve inspection techniques and suggested ways of preventing or reducing corrosion, including painting and cathodic protection. The article suggested that the piping should be inspected by visual inspection, both externally and internally, as well as by hammer testing and thickness testing. (Claimants’ Ex. MM).
 

 45. Neither Cenargo nor V Ships implemented any procedures for the inspection, testing and maintenance of seawater piping following the dissemination of the Pipe Corrosion Report. (Trial testimony of Hendry; Claimants’ Exs. NN, OO).
 

 46. In the Inspection and Quarterly Reports for June 1996, the engine room pipes were noted to be in satisfactory condition. However, in August 1996, the Chief Engineer reported that the emergency bilge suction line to the main seawater pump was holed; that the pipe was removed and that a large section of the pipe near the hole was thinned out drastically. (Claimants’ Exs. QQ — SS).
 

 47. In October 1996, Fleet Superintendent Hewitt performed an inspection of the vessel. In his Inspection Report, he commented that some of the engine room pipes and valves required replacement/attention, and he indicated that this would be done at the upcoming drydocking of the vessel. Mr. Hewitt testified that he was not referring to the seawater piping under the floor plates. (Claimants’ Ex. W; Trial testimony of Hewitt).
 

 48. In Inspection Reports dated December 1996 and March 1997, Chief Engi
 
 *1320
 
 neer Krishna reported that the condition of the engine room piping was satisfactory. He testified that he had visually inspected the pipes and performed hammer tests on the pipes before drafting the reports. (Claimants’ Exs. XX, CCC; Trial testimony of Krishna).
 

 49. The M/V MERCHANT PATRIOT was drydocked in Talcahuano, Chile in April 1997. During that period, V Ships Fleet Superintendent Hewitt did not call for any renewal or replacement of the 150mm pipes leading to either the aft pump or the forward pump. (Stip.38, 39).
 

 50. Hewitt did not perform a hammer test on any of the seawater piping during the April 1997 drydock (Trial testimony of Hewitt).
 

 51. During this drydock, some of the D rings on the vessel’s deck were renewed because they were corroded and wasted, but not all wasted D rings were renewed. (Stip.41).
 

 52. Hewitt was on board the vessel again in July 1997. At that time, Hewitt issued a nonconformance report because the vessel did not have a ship specific planned maintenance program in place. (Stip .42).
 

 53. In July 1997, Hewitt did not request that the 150mm pipe be renewed. (Stip. 44; Trial testimony of Hewitt).
 

 Cause of the Pipe Failure
 

 54. Everyone who has seen the failed pipe, or photographs of it, including Mr. Hendry of Cenargo, Messrs. Lees, Ros-seter, Mukund, and Hewitt of V Ships, Second Engineer Chakrabarti, and Chief Engineer Krishna, has acknowledged that the pipe was corroded both externally and internally,'wasted, and holed at numerous locations. (Stip. 88, Trial testimony of Rosseter; Hendry, Hewitt).
 

 55. Mr. Hendry stated that the pipe was not in acceptable condition for service aboard the vessel. (Trial testimony of Hendry).
 

 56. This condition was also observed by Mr. Daniel, The Salvage Association surveyor, who attended aboard the M/V MERCHANT PATRIOT on behalf of Cen-argo’s hull underwriters on January 11, 1998, and saw the failed section of pipe prior to its removal from the piping system. (Claimants’ Exs. OOO, p. 89-90, VW).
 

 57. The failed pipe had a thickness by design of 5.4mm. (Stip. 84; Claimants’ Ex. C).
 

 58. The failed section of pipe was less than 1mm in thickness in the area adjacent to the flange connected to the T joint of the 300mm pipe (where the rupture occurred). (Stip.85).
 

 59. Bopinder Phull, Ph.D., a corrosion scientist with the LaQue Center for Corrosion, Inc., testified that the “actual thickness in the area adjacent to the flange was .125mm (3/1000”). (Trial testimony of Phull).
 

 60. Metallurgists Thomas Ackerson, Peter Elliot (retained by claimants), and John Ambrose (retained by Cenargo and V Ships) conducted an inspection and metallurgical analysis of the failed pipe and found that the composition of the failed pipe was carbon steel. (Stip.83).
 

 61. The metallurgists could not determine if the pipe had ever been galvanized but found no obvious evidence of any protective coating on the outer diameter or inner diameter of the failed pipe. (Stip.83).
 

 62. The metallurgists did find occasional remnants of paint, identified as acrylic/polyester, observed in one or two local areas. (Stip.83).
 

 .63. At trial, a number of holes were clearly noticeable in the failed pipe section.
 

 64. Three types of corrosion combined in varying degrees to cause the failure of the pipe. In order of importance, they were galvanic corrosion, atmospheric corrosion and erosion corrosion. (Trial testimony of Phull).
 

 
 *1321
 
 65. The corrosion that caused the pipe to fail occurred over a long period of time and clearly did not arise during the course of the voyage at issue. (Trial testimony of Phull).
 

 66. Galvanic corrosion, the most significant factor in the failure of the pipe at issue, occurs at the junction of dissimilar metals. Because the 150mm carbon steel pipe was connected to the T joint of the aluminum brass pipe, a dissimilar metal, it was subject to localized, accelerated galvanic corrosion. (Trial testimony of Phull).
 

 67. Atmospheric corrosion, the second most significant factor in the failure of the pipe at issue, occurs on the exterior surface of ferrous metals such as carbon steel. It is caused by a chemical reaction that takes place when iron is exposed to water and oxygen. Evidence of atmospheric corrosion includes rust on the pipe, scaling and exfoliation, hemispherical pitting and holes. (Trial testimony of Phull).
 

 68. Erosion corrosion was not a significant factor in the rupture of the pipe at issue. (Trial testimony of Phull).
 

 Ultimate Findings of Fact
 

 69. Cenargo and V Ships, through their representatives, admit that the failed pipe should have been renewed prior to the commencement of the voyage at issue and indicate that this would have been done if they had known of the pipe’s condition. (Trial testimony of Hendry, Hewitt, Ros-seter).
 

 70. If due diligence had been exercised to make the M/V MERCHANT PATRIOT seaworthy prior to the commencement of the voyage, the poor condition of the pipe would have been identified and appropriate action could have been taken to make the vessel seaworthy. (Trial testimony of Hendry, Rosseter).
 

 71. When the M/V MERCHANT PATRIOT departed Brazil on December 19, 1997, the vessel was unseaworthy. (Trial testimony of Hendry).
 

 72. The unseaworthy condition of the M/V MERCHANT PATRIOT, i.e., the deteriorated and wasted condition of certain pipes in the seawater circulating system, caused the flooding of the engine room and the contamination of the lube oil. This resulted in the shutdown of the main engine, which then resulted in the abandonment of the ship, loss of deck cargo and damage to deck cargo.
 

 73. This Court finds that Cenargo and V Ships had privity of the conditions that caused this casualty, and that the casualty could have been averted if those having managerial responsibility for the vessel, including the Fleet Supérintendents, the Managing Directors of the companies, and Mr. Hendry had taken reasonable action.
 

 74. The following critical acts and omissions of Cenargo and V Ships establish privity:
 

 (a) There was no effective system for creating an historical record of critical information about the seawater piping and ensuring that the information was provided to those who were assigned the responsibility of overseeing vessel maintenance. In March and April of 1989, two sections of seawater piping failed and were renewed. Those failures were likely the result of galvanic corrosion. (Lees Dep. at 177). Mr. Hewitt testified that he had never seen the reports and was not aware of the earlier failures. He admitted that he would have made a more intensive inspection if he had known about them (Trial testimony of Hewitt). Both Rosseter and Hewitt admitted that it would be prudent to maintain accurate records as noted in the Corrosion Report. (Trial testimony of Hendry, Rosseter).
 

 (b) There was no planned system in effect for the inspection and maintenance of the seawater piping system. In July 1997, Mr. Hewitt issued a nonconformance report because the vessel did not have a specific planned maintenance program in place. Further, Hewitt testified that hammer tests, thickness tests and pressure
 
 *1322
 
 tests are not new techniques. He admitted that V Ships kept no written records of pipe inspections and stated that it would have been prudent to do so. Finally, Hewitt testified that he knew of ways to prevent galvanic corrosion but admitted that those techniques were not employed on the vessel. (Trial testimony of Hewitt).
 

 Mr. Lees, the Managing Director of V Ships testified that ferrous seawater pipes start to fail after five years of service. (Lees Dep. at 28). Despite this knowledge, no program was implemented to identify and renew such pipes prior to their failure in service. Moreover, even when problems warranting renewal were identified, the work was not carried out. The condition of the pipe and various other conditions depicted in photographs of the vessel indicate a lack of sufficient maintenance over a long period of time. (Claimants’ Exs. WWW
 
 &
 
 XXX, vols. 1-4).
 

 (c) There was a failure to exercise reasonable oversight. Mr. Hendry stressed the importance of the Inspection Report photographs. Significantly, V Ships never specified that photographs be taken of the seawater pipes under the floor plates in the engine room and no such photographs accompanied the Inspection Reports. (Lees Dep. at 80). Further, the failure to effect a permanent repair to the patched aft pipe after more than three years and an intervening drydock demonstrates either an ineffective follow-up system or a conscious decision to leave the patched pipe in place. Also, the inspection of the failed pipe by metallurgists retained by petitioners and claimants, as well as the Court’s own visual examination, revealed that the pipe was not painted. This should have been known by the management and should have been corrected.
 

 (d) The Corrosion Report put the petitioners on notice that galvanic corrosion is a significant problem with regard to seawater piping, especially when pipes composed of dissimilar metals are connected to each other. The accelerated corrosion produced by the joining of dissimilar metals was known by Hendry, Lees, Rosseter, Mukund and Hewitt. It was obvious by visual inspection that ferrous and non-ferrous sections of pipe were joined in the seawater circulating system of the MTV MERCHANT PATRIOT. The critical significance of galvanic corrosion on seawater piping and the importance of conducting proper inspections of such piping was noted in the Corrosion Report. (Claimants’ Ex. MM). The author of the Corrosion Report stressed the importance of diligent inspections:
 

 The aim of any inspection is to locate a weakness in pipes which have suffered from pitting and corrosion,
 
 but have not yet started to leak.
 
 This requires a closeup examination, hammer and pressure testing, plus thickness measurements, (emphasis added). (Claimants’ Ex. MM at 19639).
 

 Mr. Lees admitted that V Ships had no system in place to determine the progress or extent of galvanic corrosion where dissimilar metals are connected. (Lees Dep. at 183). Mr. Hendry testified that he would have expected V Ships to implement such procedures and that he assumed that such procedures were being carried out. (Trial testimony of Hendry).
 

 (e)The type of inspection that the petitioners employed was insufficient and unreasonable. Petitioners’ practice was to conduct only a visual examination of the seawater piping, looking for the breakdown of paint, leaks, pinholes, and evidence of temporary repairs in the form of patches. The Court finds that the implementation of additional procedures for the inspection and replacement of the seawater piping was feasible, and if a proper inspection program had been implemented, the wasted state of the pipe due to internal corrosion would have been detected. Thus, the pipe could have been renewed in drydock, thereby avoiding an emergency situation at sea, and the casualty.
 

 Bearing in mind that the galvanic corrosion process is most concentrated where
 
 *1323
 
 the dissimilar metals are connected, the ship staff should have been instructed to examine this area very carefully and to perform hammer tests around the entire circumference of the carbon steel pipe. Mukund testified that hammer testing of a ship’s piping system is a standard method of testing a pipe’s integrity. Additionally, Hendry and Rosseter admitted that if a hammer test were done prior to the commencement of the voyage, the hammer would have put a hole in the pipe. (Trial testimony of Hendry and Rosseter). Dr. Phull stated that the pipe would have been in substantially the same condition in April 1997, when the vessel was in drydock, as it was at the time of the casualty or the start of the voyage, and that a properly performed hammer test at that time would have disclosed that the pipe needed to be renewed. (Trial testimony of Phull). Further, Dr. Phull testified that ultrasonic testing could have determined the thickness of the 150mm pipe near the T joint. Finally and significantly, the petitioners failed to establish that the common industry standard was to employ only a visual inspection on seawater piping systems.
 

 Notwithstanding all of these other proper measures for inspection that the petitioners failed to employ, the Court finds that the petitioners failed to conduct even a thorough visual inspection of the seawater piping on the vessel. No one who inspected the pipe admitted to seeing a patch that was in place on the section of the pipe leading to the aft pump. This was only a few feet away from the section of the pipe leading to the forward pump. The Court also finds it improbable that none of the holes that are evident on the failed pipe existed prior to the commencement of the voyage. Further, the Alarm Book reveals that in 1997, there were at least 23 entries for the engine room bilge flooding alarm. (Claimants’ Ex. IIII). This suggests to the Court that the pipes were leaking and the holes should have been seen.
 

 Chief Engineer Krishna testified that he visually inspected the pipe in question in March 1997, and that he observed that it was painted, and there were no scaling, pitting, or holes. He also testified that he performed a hammer test and that it revealed that the pipe was sound. Based on the Court’s own examination of the failed pipe and the testimony of Dr. Phull, the Court finds that the testimony of Krishna lacks credibility. From the Court’s observations, the bare, unprotected pipe evidenced years of neglect. The Court is not convinced that between April and December, the exterior surface of the pipe deteriorated to the extent that is evident.
 

 (f) Nothing was done to impede the progress of corrosion. As noted, the pipes were not painted to reduce the impact of atmospheric corrosion. Further, nothing was done to impede the progress of galvanic corrosion. Dr. Phull testified that a means of electrical isolation is employed by the U.S. Navy and offshore drilling companies to prevent galvanic corrosion. This electrical isolation tool costs about $32.00. Additionally, the petitioners could have and should have used non-eonductive (PVC) washers, gaskets and sleeves installed at the junction of these dissimilar metals, in order to isolate the metals. In light of the availability of this inexpensive protective measure, there is no plausible reason why V Ships could not have implemented this practice.
 

 75. Cenargo was negligent and failed to exercise due diligence to make the M/V MERCHANT PATRIOT seaworthy at the commencement of the voyage and the vessel was unseaworthy when she departed Praia Mole, Brazil. The unseaworthiness of the vessel caused the casualty and the loss of and damage to the cargo being carried.
 

 76. In conclusion, the Court finds that Cenargo and V Ships had privity of the conditions that caused the casualty and are not entitled to exoneration from or limitation of liability.
 

 
 *1324
 
 C. Conclusions of Law
 

 1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333. The claims at issue in this case are maritime and admiralty claims pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims. This Court has in per-sonam jurisdiction over the parties and in rem jurisdiction over the MTV MERCHANT PATRIOT. Venue is proper in this district.
 

 Who is Permitted to Limit Liability under the Act?
 

 2. Both Cenargo and V Ships seek to limit their liability for the damages claimed in the instant case. Accordingly, both parties filed petitions seeking to invoke the
 
 Limitation of Liability Act of 1851,
 
 46 U.S.C.App. §§ 183-89, in order to limit their liability to the post-casualty value of the vessel. The Act allows the owner of a vessel to limit its liability to “the amount or value of the interest of such owner in such vessel, and her freight then pending” if that owner is without knowledge or privity of the loss-causing negligent act or unseaworthy condition. 46 U.S.CApp. § 183.
 

 3. An entity can seek to invoke the act if it is the actual owner or the owner
 
 pro hac vice. In re Complaint of Chesapeake Shipping, Inc. and Gleneagle Ship Management Co., Inc.,
 
 803 F.Supp. 872, 874 (S.D.N.Y.1992) (citing
 
 In re Petition of United States,
 
 259 F.2d 608, 610 (3rd Cir.1958)).
 

 4. As owner of the vessel, Cenargo may seek to invoke the Limitation of Liability Act.
 

 5. V Ships seeks to invoke the act as the owner
 
 pro hac vice
 
 of the M/V MERCHANT PATRIOT. The Court rejects this characterization.
 

 6. V Ships argues that it should be considered an owner
 
 pro hac vice.
 
 In
 
 Chesapeake Shipping,
 
 the court found that a ship management company was the owner
 
 pro hac vice of
 
 the vessel at issue because the company’s responsibilities included “manning the vessels; victualing the vessels; providing for navigation, which involved procuring and providing deck, engine and cabin stores; maintenance and repairs for hull and machinery; providing spare parts, maintenance and repairs for communication and navigation equipment ... and communicating with [the owner] and the vessels’ time charterers.”
 
 Chesapeake Shipping,
 
 803 F.Supp. at 873-74. The court went on to emphasize that the management company’s “role was autonomous” and described a written management agreement in effect between the parties that stated that “[t]he Manager shall be deemed for all purposes to be the employer of the officers and the crew of the Vessels. To the extent permitted by applicable law, Owner shall have no liability for personal injury claims relating to the Vessels.”
 
 Id.
 
 at 873. In the present case, V Ships relies on the
 
 Chesapeake Shipping
 
 case to argue that it should be considered an owner
 
 pro hac vice.
 

 7. This Court rejects the petitioners’ argument. Unlike the parties in
 
 Chesapeake Shipping,
 
 there was no management agreement in this case that designated V Ships as the employer of the officer and crew of the vessel “for all purposes.” Further, Cenargo did not attempt to relieve itself of liability by drafting an agreement such as the one in
 
 Chesapeake Shipping.
 
 Finally, the Court finds that V Ships’ role was not “autonomous.” The managers of V Ships were in constant contact with Hendry regarding the status of the vessels. Hendry and Cenargo had ultimate control of the operation of the MTV MERCHANT PATRIOT. The Court agrees with the claimants that the instant case is more similar to
 
 Matter of Oil Spill By The AMOCO CADIZ,
 
 954 F.2d 1279, 1302 (7th Cir.1992). In that case, the court explained that the management company “was responsible for the operation of the AMOCO CADIZ, including mainte
 
 *1325
 
 nance, repair, and training of its crew. Transport remained the owner of the vessel.”
 
 Id.
 
 at 1287. The court found that the management service “was brought in to assist and advise Transport with regard to the maintenance and operation of the ship. Ultimate authority for maintenance and operation of the AMOCO CADIZ, however, remained with [the vessel owner] alone.”
 
 Id.
 
 at 1302. Similarly, in the instant case, Cenargo was always in ultimate control of the vessel and the crew. The decisions about the direction of the vessel rested with Cenargo. Cenargo paid the salaries of the crew and Hendry was in contact with V Ships on a regular basis in order to discuss the vessels. Further, V Ships proposed an annual budget to Hen-dry, who met with V Ships directors before he approved the budget.
 

 8. Accordingly, the Court holds that V Ships’ involvement with the MTV MERCHANT PATRIOT did not rise to the status of owner
 
 pro hac vice,
 
 and V Ships therefore cannot seek to invoke the protection of the Act.
 

 Exoneration from Liability
 

 9. “A shipowner is entitled to exoneration from all liability for a maritime [casualty] only when it demonstrates that it is free from any contributory fault”.
 
 American Dredging Co. v. Lambert,
 
 81 F.3d 127, 129 (11th Cir.1996) (citing
 
 Tittle v. Aldacosta,
 
 544 F.2d 752, 755 (5th Cir. 1977)). The Court in the instant case finds that the petitioners have failed to carry this burden.
 

 10. As stated in the Court’s Findings of Fact, several agents of Cenargo and V Ships, including Mr. Hendry himself, have admitted that the pipe at issue was in terrible shape. Mr. Hendry admitted that the pipe was likely in bad shape at the time of the casualty and the ship was unseaworthy at the commencement of the voyage at issue. (Trial testimony of Hen-dry, Rosseter, Hewitt). Many of the witnesses also admitted that the pipe should have been replaced prior to the voyage and stated that a hammer test would have revealed the problem. (Trial testimony of Hendry, Rosseter, Hewitt, Phull). Accordingly, the Court finds that the petitioners at least share fault for the casualty and thus, they cannot seek exoneration from liability.
 

 Limitation of Liability
 

 11. A denial of exoneration does not necessarily preclude a finding that the petitioners are entitled to a limitation of liability. A shipowner is entitled to such a limitation if it can prove that the loss occurred without its privity or knowledge. This determination involves a two-step analysis.
 
 Hercules Carriers, Inc. v. Claimant State of Florida,
 
 768 F.2d 1558, 1563-64 (11th Cir.1985). Initially, the claimants bear the burden of proving that negligence or the unseaworthiness of the vessel caused the loss. If the claimants satisfy this burden, the burden then shifts to the petitioners
 
 [2]
 
 to demonstrate that they lacked knowledge or privity with the negligence or unseaworthiness.
 
 Id.
 

 12. The Eleventh Circuit has held that “[a] shipowner may not limit his liability under the limitation act if his ship was unseaworthy due to equipment which was defective at the start of the voyage.”
 
 Villers Seafood Co., Inc. v. Vest,
 
 813 F.2d 339, 343 (11th Cir.1987).
 

 13. In the present case, seawater damaged the cargo belonging to the claimants. Further, Hendry, the owner of the vessel, testified that the vessel was unseaworthy at the onset of the voyage. The petitioners concede that the failed pipe was at least partially responsible for the damage to the claimants’ cargo. The petitioners also concede that the pipe was defective at the beginning of the voyage. If the pipe had not burst, the crew would
 
 *1326
 
 not have felt compelled to shut down the main engine and the ship would therefore have not lost steerage. The parties stipulate that none of the cargo began shifting or breaking loose until the engine was shut down.
 

 14. Accordingly, the Court finds that the claimants satisfied their burden to prove that the unseaworthiness of the Merchant Patriot caused the loss to the cargo.
 

 15. The burden now shifts to the petitioners to demonstrate that they were without knowledge or privity of the unseaworthiness that caused the loss.
 

 16. Petitioners contend that they were without knowledge or privity because they were not aware of the defective pipe at the onset of the voyage. Knowledge and/or privity, however, include not only what the petitioner actually knows but also what the petitioner should have known.
 
 See Hercules Carriers, Inc.,
 
 768 F.2d at 1564 (holding that “knowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss”);
 
 Suzuki of Orange Park, Inc. v. Shubert,
 
 86 F.3d 1060, 1064 (11th Cir.1996) (knowledge and privity include constructive knowledge or “what the vessel owner could have discovered through reasonable inquiry”).
 

 17. In the instant case, many of the directors of V Ships, as well as Hen-dry, admitted that the defect should have been detected prior to the voyage. The petitioners concede this point, but their defense is that their management system should have enabled them to detect the problem. Because they had what they considered to be an effective management system in place, the petitioners argue that the Court should find that they did not have knowledge or privity of the loss. The Court disagrees. As stated earlier, the witnesses concede that a hammer test or a thickness test would have revealed the defect in this pipe. Further, had the petitioners kept accurate records regarding the inspections and replacements of seawater pipes, they might have determined that the pipe at issue should have been replaced. Finally, Dr. Phull’s testimony suggests that the petitioners could have implemented inexpensive mechanisms for impeding the progress of galvanic corrosion on seawater pipes.
 

 18. The petitioners argue that the casualty occurred as a result of the crew’s reaction to the flooding in the engine room. This argument has no merit for several reasons. First, Hendry and others testified that the crew responded reasonably in their attempt to patch the pipe at the time of the casualty. Second, even if the crew acted unreasonably, the petitioners admitted that the crew members were acting as agents of V Ships, who were in turn acting as agents of Cenargo. Finally, even if the crew was negligent, the casualty was not a result of an isolated act of the crew.
 
 [3]
 

 19. “Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, ‘by prior action or inaction set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty.’ ”
 
 AMOCO CADIZ,
 
 954 F.2d at 1303 (quoting
 
 Tug Ocean Prince, Inc. v. United States,
 
 584 F.2d 1151, 1158 (2d Cir.1978),
 
 cert. denied
 
 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979)).
 

 
 *1327
 
 20. In the instant case, the petitioners admit that the failed pipe was at least a contributing cause, if not the proximate cause, of the casualty. Thus, the Court finds that the petitioners failed to meet their burden and are not entitled to protection under the Act.
 

 D. Conclusion
 

 For the foregoing reasons, Cenargo’s and V Ships’ petition to seek a limitation of liability under 46 U.S.C.App. §§ 183-89 is denied. V Ships did not possess the requisite control over the MTV MERCHANT PATRIOT to be considered an owner
 
 pro hac vice
 
 for purposes of protection under the Act. Even if V Ships had met the requirements of owner
 
 pro hac vice
 
 status, neither V Ships nor Cenargo has met the burden of establishing that they did not have privity or knowledge of the loss resulting from the casualty at issue in this case.
 

 [1]
 

 . The petitioners include Cenargo Navigation, Ltd ("Cenargo”), the owner of the M/V MERCHANT PATRIOT, and V Ships (UK) Ltd.
 
 ("V
 
 Ships”), the manager of the vessel.
 

 [2]
 

 . The Court finds that even if V Ships
 
 could
 
 seek protection as an owner
 
 pro hac vice,
 
 it is still not entitled to limit its liability because, like Cenargo, V Ships had privily of the loss in this case.
 

 [3]
 

 . An owner can invoke the liability act if the casualty is a result of the isolated act of a crew member.
 
 Tittle v. Aldacosta,
 
 544 F.2d 752, 756 (5th Cir.1977) (holding that the Limitation of Liability Act "afford[s] protection to the physically remote owner who, after the ship breaks ground, has no effective control over his water-borne servants”). Here, the petitioners' failure to detect the corroded pipe was at least a contributing cause of the casualty. Accordingly, the crew’s reaction, whether negligent or not, would not enable the petitioners to claim a lack of knowledge or privity.